**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
**IN ADMIRALTY**

**CASE NO: 23-CV-61696-SINGHAL**

STARBOARD YACHT GROUP LLC
A Florida Limited Liability Company,

       Plaintiff/Counter-Defendant,

v.

M/V OCTOPUSSY a 1988 Heesen built
143-ft motor yacht, Registry No: JMP15060
her engines, tackle, boats, gear, appurtenances etc.,
*in rem*, and CONTESSA MARINE RESEARCH
LLC a Delaware limited liability Company,
*in personam*,

       Defendants/Counter-Plaintiffs,

v.

CHARLES JAKE STRATMANN, individually,

       Counter-Defendant.

_____/

## DEFENDANTS/COUNTER-PLAINTIFFS M/V OCTOPUSSY AND CONTESSA MARINE RESEARCH LLC'S ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIM AGAINST STARBOARD YACHT GROUP LLC AND CHARLES JAKE STRATMANN

The Defendants M/V OCTOPUSSY and CONTESSA MARINE RESEARCH LLC

(""Octopussy," "Contessa" and collectively "Defendants"), by and through undersigned counsel,

hereby files their Answer and Affirmative Defenses and states:

1

1. This allegation purports to state a legal conclusion rather than an allegation and no response is required.  To the extent any response is required, the allegations of paragraph 1 are denied.

2. Admitted for jurisdictional purposes only.

3. Admitted that the Verified Complaint speaks for itself. To the extent this allegation purports to state a legal conclusion rather than an allegation no response is required.  To the extent any response in required the allegations of paragraph 3 are denied.

4. Admitted for venue purposes only. Otherwise, denied.

5. Admitted for jurisdictional purposes only, otherwise denied. Denied to the extent it is alleged that a breach of contract occurred by any party except for Plaintiff.  Defendants lack information sufficient to form a belief about the truth of the allegation that "Mr. Ivankovich may reside at…" because the allegation appears incomplete as no address is set forth, therefore denied.

## THE PARTIES

6. Defendants lack information sufficient to form a belief about the truth of this allegation therefore denied.

7. Admitted.

8. Admitted.

9. Admitted.

10. Denied.

11. Denied.

12. Admitted only that the referenced document is attached to the Verified Complaint as Exhibit A. Otherwise denied.

13. Denied.

14. Defendants lack knowledge or information sufficient to form a belief about the truth of this allegation therefore denied.

### COUNT I FORECLOSURE OF A MARITIME LIEN FOR NECESSARIES

OCTOPUSSY realleges and reasserts its responses to paragraphs 1 through 14 as if fully set forth herein.

15. Denied.

16. Denied.

17. Denied.

18. Denied.

19. Admitted that payments have been made. Otherwise, denied.

20. Denied.

21. Denied.

22. Denied.

23. Denied.

All allegations not specifically admitted herein are denied.  In addition, OCTOPUSSY denies each and every allegation contained in Plaintiff's wherefore clauses, denies Plaintiff is entitled to the relief requested and denies that Plaintiff is entitled to any relief.

### COUNT II BREACH OF MARITIME CONTRACT VS DEFENDANT CONTESSA MARINE RESEARCH

CONTESSA re-alleges and reasserts its responses to Paragraphs 1 through 14 as if fully set forth herein.

24. Denied.

25. Denied.

26. Denied.

27. CONTESSA is without knowledge or information sufficient to form a belief about the truth of this allegation therefore denied.

28. Denied.

29. Denied.

30. Denied.

31. Denied.

32. Denied.

All allegations not specifically admitted herein are denied.  In addition, CONTESSA denies each and every allegation contained in Plaintiff's wherefore clause, denies Plaintiff is entitled to the relief requested and denies that Plaintiff is entitled to any relief.

## AFFIRMATIVE DEFENSES

## FIRST AFFIRMATIVE DEFENSE

As and for its First Affirmative Defense, Defendants state that Plaintiff fails to state a cause of action for foreclosure of maritime line because SYG, as project manager, was a general agent and not a special agent.  A general agent is not entitled to a maritime lien as a matter of law.

## SECOND AFFIRMATIVE DEFENSE

As and for its Second Affirmative Defense, Defendants allege that Plaintiff fails to state a cause of action for a maritime lien  because Plaintiff did not provide necessaries to the vessel within the meaning of maritime law and the Federal Maritime Lien Act, and/or Plaintiff was not authorized to provide the labor, equipment, parts, work and other items it claims it provided to the Vessel, Plaintiff is seeking sums for labor not provided and/or parts not supplied including 10% markup,  and/or Plaintiff provided and/or caused to be provided equipment, materials, labor, work and parts to the vessel without authorization and/or not at a reasonable price.

## THIRD AFFIRMATIVE DEFENSE

As and for its Third Affirmative Defenses, Defendants state that there is no lien because no payment is due to Plaintiff and no amount is owed as all monies have been paid. Rather, Defendants overfunded monies paid to Plaintiff for the refit project by at least $2,300,000.00 so that Plaintiff owes Defendants monies in the amount of at least $2,300,000.00.

## FOURTH AFFIRMATIVE DEFENSE

As and for its Fourth Affirmative Defense, Defendants states that there is no maritime lien because the M/V OCTOPUSSY is a dead ship.

## FIFTH AFFIRMATIVE DEFENSE

As and for its Fifth Affirmative Defenses, Defendants state that the amounts claimed by Plaintiff are fraudulent and the result of fraud.  Plaintiff created fake invoices that were never received by Defendants during the course of the refit project in order to cover up its misappropriation and unauthorized use of the money.  Plaintiff created the invoices after its fraud and theft was discovered and Plaintiff included terms that are beneficial to Plaintiff but were never agreed to by Defendants or approved of by Defendants.   In fact, during the course of the refit project, Defendants asked Plaintiff for backup, and it was not provided.  Plaintiff paid itself monies without authority or approval from Defendants and in breach of the terms of the refit project agreement.

## SIXTH AFFIRMATIVE DEFENSE

As and for its Sixth Affirmative Defense, Defendants state that Plaintiff failed to mitigate its damages, if any, including by performing unnecessary, unauthorized, and duplicative work including but not limited to "engineering studies for the use of hydrogen fuel."  Therefore, any damages awarded to Plaintiff should be reduced accordingly.

**SEVENTH AFFIRMATIVE DEFENSE**

As and for its Seventh Affirmative Defense, Defendants state that Plaintiff was the first to breach the refit project agreement including by failing to complete the refit work in a timely manner and in accordance with industry standards, provided and/or caused to be provided equipment, materials, and parts to the vessel without authorization and/or not at a reasonable price or agreed upon price. Plaintiff exceeded the budget of $4,000,000.00 without Defendants authority and/or without Defendants' knowledge.

**EIGHTH AFFIRMATIVE DEFENSE**

As and for its Eighth Affirmative Defense, Defendants state that Plaintiff's claims are barred by the doctrine of unclean hands because Plaintiff overcharged for shoddy work,  billed for work not performed, billed for  parts and materials not purchased, billed for equipment that was not necessary, improperly marked up invoices, misappropriated funds, performed work and purchased materials that were not authorized, purchased equipment that it did not have authority to purchase, and Plaintiff failed to perform its obligations as project manager in accordance with industry standards.

**NINTH AFFIRMATIVE DEFENSE**

As and for its Ninth affirmative Defense, Defendants state that Plaintiff's clams are blocked by accord and satisfaction as all amounts due to Plaintiff were paid.  Defendants owe Plaintiff no money.

**TENTH AFFIRMATIVE DEFENSE**

As and for its Tenth Affirmative Defense, Defendants are entitled to a setoff against any judgment in Plaintiff's favor for all payments made to Plaintiff, payments made by Defendants for

payments that should have been paid by Plaintiff, and for equipment/parts/materials purchased and returned.

## COUNTERCLAIM

Counter-Plaintiff CONTESSA MARINE RESEARCH LLC ("Counter-Plaintiff" or "Contessa") by and through undersigned counsel, hereby files the following counterclaim against STARBOARD YACHT GROUP LLC ("SYG"), and CHARLES JAKE STRATMANN individually ("Mr. Stratmann") (collectively "Counter-Defendants"), pursuant to Fed, R. Civ. P. 13.  In support, Counter-Plaintiff states the following:

## PARTIES JURISDICTION AND VENUE

1. This is an action for breach of contract, unjust enrichment, conversion, fraud and negligent misrepresentation.

2. This court has jurisdiction because this is a compulsory counterclaim under Fed. R. Civ. P. 13 because it arises out the same transaction or occurrence that is the subject matter of Starboard Yacht Group's claim.

3. This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) because the asserted counter claims are so related to the claims in the Verified Complaint within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

4. At all times material hereto, Starboard Yacht Group LLC ("SYG") is and was a Florida Limited Liability Company that maintains its principal place of business at 850 NE Third Street Suits 208, Dania Florida 33004 and was hired as project manager for M/Y Octopussy for the refit.

5. Charles Jake Stratmann (Mr. Stratmann"), is the manager and principal of Starboard Yacht Group.  Mr. Stratmann is a U.S. citizen and resident of the State of Florida.

6. Contessa Marine Research LLC is a Delaware limited liability company.

7. The vessel, M/V Octopussy ("Vessel" or "Octopussy") is a Jamaican Flagged (Registry No: JMP15060), 143 Foot 1988 Heesen built motor yacht.

8. Venue is proper in the Southern District of Florida because Counter-Defendants engage in substantial activity in this district, including vessel repair and all alleged services and "necessaries" were provided to Octopussy in this district and the Octopussy was located in this district at the time the causes of action accrued.

9. All conditions precedent to bringing this counterclaim have occurred, been performed, waived and/or are excused.

## GENERAL ALLEGATIONS

10. On or about May 24, 2022, Contessa hired SYG to act as project manager for the refit of Octopussy.  Octopussy is a 1988 Heesen built motor yacht.

11. The refit scope was to do critical systems only for safe operation.  SYG did not have authority to refurbish all systems and bring this more than 30 years old yacht to "like new condition."

12. Contessa and SYG agreed that the terms of the Project Management Agreement were that:

    a. Contessa would pay SYG a project management fee only in the amount of $3,000.00 per week in exchange for SYG carrying out its duties as project manager with respect to the refit project. *See Exhibit 1.*

    b. SYG was required to keep accounting records and perform the work on an open book basis.

c.  SYG was required to complete a project refit budget, not to exceed $4 million dollars.

d.  SYG was required to complete a scope of work and priorities list.

e.  SYG was required to organize all third-party vendor contracts and pricing and review with Contessa weekly

f.  SYG was required to negotiate best pricing on all needed parts and materials to keep costs in line with the budget.

g.  All scopes of work required authorization and approval from Contessa.

h.  The project was to be completed within 12 to 14 months therefore by July 2023.

i.  Payment of a project management fee only was agreed to because SYG had never undertaken a project of this size and scope, and this was in return for Contessa giving SYG this opportunity which was of great value for SYG's business.

13. As project manager, SYG's responsibilities further included:  creating a scope of work, creating a budget, creating a build schedule, selecting vendors, create an estimate for time and necessary components and activities, identifying potential vendors, soliciting bids for products and services from potential vendors, selecting the best quote from potential vendors, recommending the best quote to Contessa by submitting quotes and proposals, and coordinating with contractors and vendors for the procurement, delivery, receipt, and installation of purchased components and services.

14. SYG, through Jake Stratmann, would send emails requesting funding.

15. Contessa would send wires for a dollar amount and not for particular invoices. *A summary of the wires and the wires are attached hereto as Exhibit 2.*

16. This was accepted by Contessa because it trusted that SYG, through Mr. Stratmann, was requesting amounts due and properly applying the funds as directed and as agreed.

17. In fact, Mr. Stratmann made numerous statements, stating that he and SYG can be trusted and were functioning honestly and in Contessa's best interests.

    a.  On May 24, 2022, Mr. Stratmann emailed Mr. Ivankovich "Wanted to show some transparency as we are starting the PM [project manager] role onboard Octopussy…look forward to having more visibility and working with your team by bringing more assets, value and accountability." *See Exhibit 1.*

    b.  On May 25, 2022, Mr. Stratmann emailed Frank Mulder, stating "I am writing representing the best interest of Octopussy and the current owner..." *See email dated May 25, 2022 attached as Exhibit 3 (relevant portion is highlighted).*

    c.  On March 1, 2023, Mr. Stratmann emails Mr. Ivankovich, "Truth is the Right answer is our 1st core value!" *See Exhibit 4.*

    d.  On March 1, 2023 Mr. Stratmann emails Mr. Ivankovich, "SYG makes decisions on our core values ("Truth is the right answer, show you care, Give it your all, willing to learn, think forward.) What we do is use innovative technology better than new for the ultimate boating experience." *See Exhibit 4.*

    e.  On March 1, 2023 Mr. Stratmann emails Mr. Ivankovich, "We make things happen and find ways to do so efficiently to reduce costs." *See Exhibit 4.*

18. Between April 8, 2022 and March 31, 2023, Contessa wired SYG a total amount of $4,504,641.18. *A copy of the payments made by Contessa to SYG is attached as Exhibit 2.*

19. By March 1, 2023, with no real budget created by SYG, no design plan, and no build schedule, SYG had received $3,504,640.42 from Contessa Marine. *See Exhibit 2.*

20. On March 31, 2023, SYG received an additional One Million Dollars from Contessa. *See Exhibit 2.*

21. The wires made by Contessa between February 2023 through and including the last wire of $1,000,000.00 on March 31, 2023, zeroed out any balance plus a $100,000.00 surplus according to SYG's own accounting.

22. To date, no more than $1,498,067.24 can be accounted for by SYG or Mr. Stratmann.

23. Upon information and belief, Contessa overpaid SYG by at least $2.3 million for the Octopussy refit project.

24. On or about March 23, 2023, Mr. Ivankovich ordered that SYG stop all work on his projects, including the Octopussy refit, in order to conduct an audit to account for the monies paid to SYG.

25. Thereafter, upon information and belief, SYG created a series of internal invoices, which it calls Repair Orders, to account for Contessa's money.

26. The repair orders created by SYG contain false statements for the amounts due from Contessa because, *inter alia*, the invoices charge for labor, services, and parts that were never authorized and/or not performed or purchased, false labor charges, double billing for labor and a 10% markup that was never authorized.

27. The repair orders contain terms that were never disclosed or agreed to including that David J. Brenan will direct and review compliance with the Florida Yacht Refit Sales Tax 1 M cap regulations.

28. A majority of the invoices referenced in Exhibit A of the Verified Complaint were entered on the same day, June 10, 2022, which is before work referenced in the particular repair order was even done or the third party vendor was hired.

29. None of the invoices contain a labor breakdown or any detail to substantiate the amounts claimed.

30. SYG even double billed for labor.  For example, SYG employee David Erb billed for "remove all Kamewa" on the same dates (1) January 5, 2023 and (2) February 15, 2023, for two different repair orders:  40590 and 40539.  Also on January 5, 2023, while David Erb billed for "Remove all Kamewa equipment" in Repair Order 40539 per the "labor record," SYG also billed David Erb for "cut and rig main" in RO 40590 on the same date and same time.  *A copy of Repair Orders 40539 and 40590 with corresponding timesheets are attached as Composite Exhibit 5 with the referenced entries highlighted.*

31. The Repair Orders created by SYG were not delivered to Contessa.

32. SYG and Mr. Stratmann included terms in the repair orders which it knows are not true and which were not agreed to.

## <u>COUNT I BREACH OF CONTRACT (AGAINST SYG)</u>

33. Contessa realleges and reasserts paragraphs 1 through 32 as if fully set forth herein.

34. This is action for breach of contract.

35. On or about May 24, 2022, Contessa and SYG entered into an agreement whereby SYG was to act as project manager for the refit of OCTOPUSSY ("Project Management Agreement").

36. The terms of the Project Management Agreement were that:

    a.  Contessa would pay SYG a project management fee only in the amount of $3,000.00 per week in exchange for SYG carrying out its duties as project manager; See *Exhibit 1.*

    b.  The refit budget was not to exceed $4 million dollars;

    c.  SYG was required to keep accounting records and perform the work on an open

book basis;

    d.  SYG was required to complete a scope of work and priorities list;

    e.  SYG was required to organize all third-party vendor contracts and pricing and review with Contessa weekly;

    f.  SYG was required to negotiate best pricing on all parts and materials to keep costs in line with the budget;

    g.  All scopes of work required authorization and approval from Contessa;

    h.  The project was to be completed within 12 to 14 months therefore by July 2023.

37. Implied in the Project Management Agreement was that SYG was to perform its duties as project manger in accordance with standard project manager standards within the maritime industry and in good faith.

38. In addition to the weekly project management fee, Contessa would fund the scopes of work and equipment purchased from Third party Vendors and subcontractors.

39. The work, equipment and materials supplied by Third party vendors and contractors were subject to competitive bidding by SYG and approval by Contessa.

40. SYG was required to be accountable and transparent with fund requests and spending of Contessa's monies.

41. SYG materially breached the Project Management Agreement by its action and inactions, including, without limitation:

    a.  Failing to obtain Contessa's authorization and approval on subcontracted work and third-party vendor contracts;

b.  Making payment of invoices, whether to itself or a third party, marked up above cost; it other words, charging a 10% markup or a cost-plus fee that was not agreed to;

c.  Appropriating monies for third party vendors for itself, in a manner inconsistent with the Project Management Agreement;

d.  Charging for labor not performed by SYG;

e.  Double billing for labor allegedly performed by SYG employees, and without authorization;

f.  Failing to adhere to standard project management standards;

g.  Failing to invoice bi-weekly as agreed;

h.  Failing to account for payment to third party vendors and contractors;

i.  Failing to account for the $4,504,641.18 received from Contessa;

j.  Failing to obtain approval and authorization for invoiced work;

k.  Failing to complete the design phase of the project;

l.  Failing to create a build schedule and budget;

m.  Billing and/or accepting payment for work not performed;

n.  Billing and/or accepting payment for work not authorized;

o.  Billing and/or demanding payment that was not then due;

p.  Failing to act in good faith including submitting budgets with miscalculations and paying itself;

q.  Not paying third party vendors with monies allocated for the refit project;

r.  Failing to complete the project on time causing increased and additional costs due to delays caused by SYG.  The delays caused by SYG could have been avoided had

14

SYG not breached the Project Management Agreement;

s.   Wrongfully and fraudulently invoicing and collecting payment on invoices for labor, materials and other amounts for work not performed and materials not ordered;

t.   Failing to pay third party vendors and subcontractors;

u.   Failing to properly perform work so that the work needs to be redone;

v.   Failing to fully, properly and timely perform its work in accordance with the customary and industry standards and the Project Management Agreement;

w.   Failing to properly carry out the dismantling of Octopussy by not having any plans or drawings for the reconstruction, despite repeated requests for such drawings and documentation, thereby causing damage that needs to be assessed and is approximated to be in the millions of United States Dollars;

42.  As a direct and proximate cause of SYG's material breaches of the Project Management Agreement, Contessa has been damaged.

43.  Contessa was further required to pay amounts incurred by SYG, for which SYG received monies from Contessa to pay these amounts, directly to third party vendors and subcontractors.

WHEREFORE, Contessa demands judgment against SYG for all damages including but not limited to, interest and costs, attorney's fees, special and consequential damages including cost of delay and damages caused by the delay, loss of reputation, loss revenue from chartering, cost for transporting the vessel to Dubai, and for such other and further relief as this Court deems just, equitable and proper.

### COUNT II UNJUST ENRICHMENT
### (PLED IN THE ALTERNATIVE AGAINST SYG)

44. Contessa realleges and incorporates the allegations contained in Paragraphs 1 through 11 and Paragraphs 13 through 32 as if fully set forth herein.

45. This is an action for unjust enrichment.

46. At all times material hereto, Contessa paid to SYG $4,504,641.18 which was for payment to third party vendors and subcontractors. *See Exhibit 2.*

47. SYG has knowledge of the benefit of the $4,504,641.18. conferred by Contessa as the monies were requested by SYG and received by SYG. *See Exhibit 2.*

48. SYG voluntarily accepted and retained the benefit of $4,504,641.18 conferred by Contessa.

49. To date, SYG is only able to account for at most $1,476,646.46 of the $4,504,641.18 that it received from Contessa.   Accordingly, SYG received and is not able to account for $3,027,994.72, which is a benefit to SYG.

50. The circumstances are such that it would be inequitable for SYG to retain the benefits conferred upon it by Contessa without paying the value thereof to Contessa.

WHEREFORE, Contessa demands judgment against SYG for all damages, including but not limited to interest and costs and for such other relief as this Court deems just, equitable and proper.

### COUNT III CONVERSION (AS TO SYG)

51. Contessa reasserts and realleges Paragraphs 1 through 32 as if fully set forth herein.

52. This is an action for conversion against SYG.

53. Between April 8, 2022, and March 31, 2023, Contessa wired SYG $4,504,641.18.

16

54. A copy of the wire payments from Contessa to SYG amounting to $4,504,641.18 are attached as *Exhibit 2.*

55. Contessa made the wire payments amounting to $4,504,641.18 at the request of SYG, the project manager, including for the Octopussy refit project.

56. The purpose of the $4,504,641.18 wired by Contessa to SYG as project manager was for SYG to properly allocate the funds to third party vendors and subcontractors. SYG was not authorized to allocate the monies to itself.

57. SYG wrongfully converted the monies when it applied the monies in a manner inconsistent with its purpose and for which it was not authorized. SYG's wrongful application of the monies included payments to itself.

58. To date, SYG is not able to account for $3,027,994.72 thereby depriving Contessa of its right to possess its money.

59. SYG was obligated to account for the $4,504,641.18 and make authorized payment to third party vendors and or subcontractors for approved work.

60. Contessa has not demanded return of the monies since doing so would be futile because on September 1, 2023, SYG filed this lawsuit claiming it is owed an additional $2,219,616.48.

61. Contessa has suffered damages due to SYG's conduct, such as but not limited to, being deprived of $3,027,994.72.

WHEREFORE, Contessa demands judgment against SYG for all damages, including but not limited to interest and costs and for such other relief as this Court deems just, equitable and proper.

## <u>COUNT IV CONVERSION (AGAISNT CHARLES JAKE STRATMANN)</u>

62. Contessa reasserts and realleges Paragraphs 1 through 32 as if fully set forth herein.

63. This is an action for conversion against Mr. Stratmann individually.

64. Between April 8, 2022, and March 31, 2023, Contessa paid SYG $4,504,641.18. *See Exhibit 2.*

65. At all relevant times, Mr. Stratmann acted as the manager, principal, and CEO of SYG.

66. Mr. Stratmann individually requested the funded amounts, and was responsible for the accounting of the monies and payment of the monies, he exercised control over the monies, and he  was the authorized signatory on checks and was the person authorized by SYG to make payment and disburse the monies belonging to Contessa.

67. A copy of the wire payments from Contessa to SYG amounting to $4,504,641.18 is attached as *Exhibit B*.

68. Contessa made the wire payments amounting to $4,504,641.18 at the request of Mr. Stratmann.

69. The purpose of the $4,504,641.18 wired by Contessa to Mr. Stratmann was for SYG to properly allocate the funds to third party vendors and subcontractors.  Mr. Stratmann was not authorized to allocate the monies to himself or to SYG.  All payments required Contessa's approval and authorization.

70. Mr. Stratmann wrongfully converted the monies when he applied the monies in a manner inconsistent with its purpose and for which it was not authorized.

71. As a manager of the company and signatory on the checks and the bank account, Mr. Strattman participated in and committed the conversion.

72. Mr. Stratmann is obligated to account for the $4,504,641.18.

73. To date, Mr. Stratmann is not able to account for $3,027,994.72 thereby depriving Contessa of its right to possess its money.

74. Contessa has not demanded return of the monies since doing so would be futile because on September 1, 2023, this lawsuit was filed, and Mr. Stratmann executed a verified complaint claiming an additional $2,219,616.48 in payment is owed.

75. As part of this lawsuit, Mr. Stratmann created and thereafter produced invoices that are fraudulent and were created for purposes of the litigation, and contain terms and items not agreed to by Contessa.

76. Contessa has suffered damages due to Mr. Stratmann's conduct, such as but not limited to, being deprived of $3,027,994.72.

WHEREFORE, Contessa demands judgment against Charles Jake Strattmann for all damages, including but not limited to interest and costs and for such other relief as this Court deems just, equitable and proper.

### COUNT V FRAUD AS TO CHARLES JAKE STRATMANN INDIVIDUALLY

77. Contessa reasserts and realleges Paragraphs 1 through 32 as if fully set forth herein.

78. This is an action for fraud.

79. At all relevant times, Mr. Stratmann acted as the manager, principal, and CEO of SYG.

80. When SYG was project manager, Mr. Stratmann made false statements concerning the material fact of amounts owed by Contessa including making requests for funding stating that amounts were due for the Octopussy refit and otherwise from Contessa that he knew were false.

81. The amounts requested by Mr. Stratmann were not supported by invoices or other backup.

82. Rather, Mr. Stratmann sent spreadsheets with incorrect and unsupported figures.  For example, on March 1, 2023, Mr. Stratmann sent an email to Mr. Ivankovich requesting and representing that $1,494,780.35 was required for funding.  There was an error in the formula used

by SYG so that the total was significantly inflated.  Upon information and belief, this mistake was intentional.

83. Mr. Stratmann knew that the representations for amounts due were false and intended that the representations that certain sums of monies were due be relied on by Contessa and in fact were relied on by Contessa.

84.  Between April 8, 2022, and March 31, 2023, Contessa wired SYG $4,504,641.18. *Exhibit 2.*

85. To date, Mr. Stratmann can only account for $1,476,646.46.

86. As a result, Contessa was damaged by the false representations that monies were due, which it relied on as evidenced by the wires, because SYG is not able to account for $3,027,994.72.

87. As a result of Mr. Stratmann's false statements of material facts, Contessa overfunded the refit project by at least $2.3 million.

88. Further, on or around April 26, 2022, Jake Stratmann falsely stated that Contessa immediately needed to purchase three (3) Seakeepers stabilizers for Octopussy costing approximately $983,729.30 but that could be discounted to approximately $803,400.00, even though there was no design plan for the vessel or build schedule.  SYG knew this representation was false.

89. SYG was a Seakeeper Dealer and held itself out as the 2021 Seakeeper dealer of the year and so therefore Mr. Stratmann is incentivized to sell Seakeepers.

90. Mr. Stratmann, with the trust of Contessa, intended to induce Contessa to rely on his representation that it knew to be false regarding the necessity and urgency to purchase the Seakeepers.

91. Contessa relied on the statement and did in fact purchase the Seakeepers. To date, the Seakeepers have not been installed as there was never even a design plan completed by SYG.  Now the Seakeepers are outdated models.

92. Contessa was injured as a result of relying on the false statement of material fact because it ordered and purchased the Seakeepers that are now old outdated models, and no longer needed or of no use.

WHEREFORE, Contessa demands judgment against Charles Jake Stratmann for all damages, including but not limited to interest and costs and for such other relief as this Court deems just, equitable and proper.

<u>**COUNT VI FRAUD AS TO SYG**</u>

93. Contessa reasserts and realleges Paragraphs 1 thought 32 as if fully set forth herein.

94. SYG, as project manager, made false statements concerning the material fact of amounts owed by Contessa.

95. SYG, through Jake Stratmann, made false statements concerning the material fact of amounts owed by Contessa including making requests for funding stating that amounts were due for the Octopussy refit and otherwise from Contessa that it knew was false.

96. The amounts requested by SYG were not supported by invoices or other backup.

97. SYG falsely claims in its Verified Complaint, through Mr. Stratmann, that it provided materials and labor to repair the vessel, parts and machinery and dockage in the total amount of $5,922,825.60 of which $2,219,616.48 remains due and owing.

98. This is a false statement of material fact which SYG is not able to back up or substantiate so that it knows it is false.

99. While project manager, SYG also sent spreadsheets with incorrect and unsupported figures.  For example, on March 1, 2023, SYG sent an email to Mr. Ivankovich requesting and representing that $1,494,780.35 was required for funding.

100. In fact, there was an error in the formula used by SYG so that the total was significantly inflated.  *A copy of the email is attached as Exhibit 4.* Upon information and belief, this mistake was intentional.

101. SYG intended that the false statements that certain sums of monies were due be relied on by Contessa and in fact were relied on by Contessa.

102. Between April 8, 2022, and March 31, 2023, Contessa wired SYG $4,504,641.18.

103. To date, SYG can only account for $1,476,646.46.

104. As a result, Contessa was damaged by the false statements that monies were due, which it relied on, because SYG is not able to account for $3,027,994.72.

105. As a result of the false statements, Contessa overfunded the refit project by at least $2.3 million.

106. Further, on or around April 26, 2022, SYG, through Jake Stratmann, made a false statement concerning the material fact that Contessa immediately needed to purchase three (3) Seakeepers stabilizers for Octopussy costing approximately $983,729.30 but that could be discounted to approximately $803,400.00, even though there was no design plan for the vessel or build schedule.  SYG knew this representation was false.

107. SYG was a Seakeeper Dealer and even held itself out as the 2021 Seakeeper dealer of the year and is therefore incentivized to sell Seakeepers.

108. SYG, as project manager and with the trust of Contessa, intended to induce Contessa to rely on its representation regarding the necessity and urgency to purchase the Seakeepers.

109. Contessa relied on the statement and did in fact purchase the Seakeepers. To date, the Seakeepers have not been installed as there was never even a design plan completed by SYG.  Now the Seakeepers are outdated models and not needed.

110. Contessa was injured as a result of relying on the representation because it ordered and purchased the Seakeepers that are now old, outdated models, and, with no design plan, not of any use and no longer needed.

WHEREFORE, Contessa demands judgment against SYG for all damages, including but not limited to interest and costs and for such other relief as this Court deems just, equitable and proper.

## COUNT VII NEGLIGENT MISREPRESENTATION AS TO SYG

111. Contessa reasserts and realleges Paragraphs 1 thought 32 as if fully set forth herein.

112. SYG, in the course of its business and employment as project manager for Contessa and Octopussy, made misrepresentations concerning the material fact of amounts owed by Contessa.

113. SYG, through Jake Stratmann, made requests for funding for the Octopussy Refit and otherwise from Contessa which it knew was a misrepresentation, made the misrepresentation without knowledge of its truth or falsity or should have known the representation was false.

114. SYG was negligent in making the statement because it should have known the representation was false.

115. The amounts requested by SYG were not supported by invoices or other backup.

116. SYG misrepresents in its Verified Complaint, through Mr. Stratmann, that it provided

materials and labor to repair the vessel, parts and machinery and dockage in the total amount of $5,922,825.60 of which $2,219,616.48 remains due and owing.

117. This is a misrepresentation of material fact which SYG is not able to back up or substantiate.

118. While project manager, SYG sent spreadsheets with incorrect and unsupported figures.  For example, on March 1, 2023, SYG, through Mr. Stratmann, sent an email to Mr. Ivankovich requesting and representing that $1,494,780.35 was required for funding.

119. In fact, there was an error in the formula used by SYG so that the total was significantly inflated.  *A copy of the email is attached as Exhibit 4.*

120. SYG intended to induce Contessa to rely on the misrepresentation that certain sums of monies were due.

121. Contessa in fact relied on the misrepresentation that the requested sums of monies were due.

122. Between April 8, 2022, and March 31, 2023, Contessa wired SYG $4,504,641.18.

123. To date, SYG can only account for $1,476,646.46.

124. As a result, Contessa was injured by the misrepresentation that monies were due, which it justifiably relied on, because SYG is not able to account for $3,027,994.72.

125. As a result of the misrepresentations, Contessa overfunded the refit project by at least $2.3 million.

126. Further, on or around April 26, 2022, SYG, through Jake Stratmann, made misrepresentations concerning the material fact that Contessa immediately needed to purchase three (3) Seakeepers stabilizers for Octopussy costing approximately $983,729.30 but that could be discounted to approximately $803,400.00, even though there was no design plan for the vessel

or build schedule.  SYG was a Seakeeper Dealer and even held itself out as Seakeeper dealer of the year and is therefore and otherwise incentivized to sell Seakeepers. SYG should have known that its representations that Contessa needed Seakeepers for Octopussy and/or immediately needed to purchase these Seakeepers were false, made the misrepresentation without knowledge of its truth or falsity or should have known the representations were false.

127. SYG was negligent in making these statements because it should have known the representations were false.

128. SYG, as project manager and with the trust of Contessa, intended to induce Contessa to rely on its representation regarding the necessity and urgency to purchase the Seakeepers

129. Contessa justifiably relied on the statements and did in fact purchase the Seakeepers. To date, the Seakeepers have not been installed as there was never even a design plan completed by SYG.  Now the Seakeepers are outdated models and not needed.

130. Contessa was injured as a result of justifiably relying upon the misrepresentation because it ordered and purchased the Seakeepers that are now old, outdated models, and, with no design plan, not of any use and are not needed.

WHEREFORE, Contessa demands judgment against SYG for all damages, including but not limited to interest and costs and for such other relief as this Court deems just, equitable and proper.

### COUNT VIII NEGLIGENT MISREPRESENTATION AS TO CHARLES JAKE STRATMANN INDIVIDUALLY

131. Contessa reasserts and realleges Paragraphs 1 through 32 as if fully set forth herein.

132. At all relevant times, Mr. Stratmann acted as the manager, principal and CEO of SYG.

133. Mr. Stratmann made requests for funding stating amounts were due for the refit and otherwise from Contessa which he knew was a misrepresentation, made the misrepresentation without knowledge of its truth or falsity or should have known the representation was false.

134. Mr. Stratmann was negligent in making the statements because he should have known the representations were false.

135. The amounts requested by Mr. Stratmann were not supported by invoices or other backup.

136. Rather, Mr. Stratmann sent spreadsheets with incorrect and unsupported figures.  For example, on March 1, 2023, Mr. Stratmann sent an email to Mr. Ivankovich requesting and representing that $1,494,780.35 was required for funding.  There was an error in the formula used so that the total was significantly inflated.  *A copy of the email is attached as Exhibit 4.*

137. Mr. Stratmann intended to induce Contessa to rely on the misrepresentation that certain sums of monies were due.

138.  Between April 8, 2022, and March 31, 2023, Contessa wired SYG $4,504,641.18.  *See Exhibit 2.*

139. To date, Mr. Stratmann can only account for $1,476,646.46.

140. As a result, Contessa was injured by the misrepresentation that monies were due, which it justifiably relied on as evidenced by the wires, because SYG is not able to account for $3,027,994.72.

141. As a result of Mr. Stratmann's misrepresentations, Contessa overfunded the refit project by at least $2.3 million.

142. Further, on or around April 26, 2022, Mr. Stratmann, made misrepresentations concerning the material fact that Contessa immediately needed to purchase three (3) Seakeepers

stabilizers for Octopussy costing approximately $983,729.30 but that could be discounted to approximately $803,400.00, even though there was no design plan for the vessel or build schedule.

143. SYG was a Seakeeper Dealer and even held itself out as Seakeeper dealer of the year and therefore Mr. Stratmann is incentivized to sell Seakeepers.

144. Mr. Stratmann should have known that his representations that Contessa needed Seakeepers for Octopussy and/or immediately needed to purchase Seakpeepers were false, made the misrepresentations without knowledge of its truth or falsity or should have known that the representations were false.

145. Mr. Stratmann was negligent in making these statements because he should have known the representations were false.

146. Mr. Stratmann intended to induce Contessa to rely on his representations regarding the necessity and urgency to purchase the Seakeepers.

147. Contessa justifiably relied on the statements and did in fact purchase the Seakeepers. To date, the Seakeepers have not been installed as there was never even a design plan completed. Now the Seakeepers are outdated models and are not needed.

148. Contessa was injured as a result of justifiably relying upon the misrepresentation because it ordered and purchased the Seakeepers that are now old, outdated models, and, with no design plan, not of any use.

WHEREFORE, Contessa demands judgment against Charles Jake Stratmann for all damages, including but not limited to interest and costs and for such other relief as this Court deems just, equitable and proper.

## COUNT IX BREACH OF FIDUCIARY DUTY AS TO SYG AND CHARLES JAKE STRATMANN

149. Contessa reasserts and realleges paragraphs 1 through 32 as if fully set forth herein.

150. At all times material hereto, SYG and Mr. Stratmann owed a fiduciary duty to Contessa.

151. On or about May 24, 2022, Contessa hired SYG to act as project manager for the refit project.

152. At all relevant times, Mr. Stratmann acted as the manager, principal and CEO of SYG

153. As project manager, SYG and Mr. Stratmann shared a relationship whereby Contessa reposed trust and confidence in SYG and Mr. Stratmann and thus SYG and Mr. Stratmann owed a fiduciary duty to Contessa.

154. Mr. Stratmann further asked for Contessa's trust and confidence which trust was reposed by Contessa and accepted by Mr. Stratmann and SYG.

155. From the beginning of the relationship, SYG and Mr. Stratmann represented to Contessa, specifically to Mr. Ivanovich, that SYG and Mr. Stratmann can be trusted. SYG and Mr. Stratmann further undertook such trust and confidence and assumed a duty to advise, counsel and protect Contessa.

156. SYG and Mr. Stratmann knowingly breached their fiduciary duty to Contessa.

157. SYG's and Mr. Stratmann's breaches of the fiduciary duty it owed to Contessa, separate and apart from its breaches of the Project Management Agreement, include but are not limited to:

    a.    Failing to act in the best interest of Contessa;

    b.    Creating false invoices;

    c.    Claiming amounts due that are not in fact due, charging for labor that was not performed, and charging for parts and equipment that were not purchased;

    d.    Billing for work and labor that was never performed;

e.    Requiring funding resulting in an overpayment;

f.    Failing to account for monies received from Contessa;

g.    Charging a 10% markup that was not agreed to;

h.    Converting Contessa' funds for its own use and in an unauthorized manner;

i.    Failing to obtain authorization to perform work;

j.    Performing unauthorized work and labor;

k.    Entering into agreements to purchase materials, parts and supplies without authorization;

l.    Exceeding the agreed budget;

m.    Applying Contessa's funds to pay itself without authorization;

n.    Failing to seek bids from other dealers and suppliers of Seakeepers in order to get the best price;

o.    Exploiting its position to financially benefit by, including but not limited to, purchasing equipment such as air conditioners which it then leased to Contessa at an inflated cost instead of suggesting that the system be bought and owned by Contessa;

p.    Failing to negotiate best pricing on all needed parts and materials to keep costs in line with the budgets in order to financially benefit;

q.    Failing to act in good faith including submitting budgets with miscalculations and paying itself when it was not permitted;

r.    Exploiting Contessa for its financial benefit and gain;

s.    Failing to properly estimate and disclose the cost of systems and works in order to financially benefit by performing the work that it knew would not be approved had

the true cost been disclosed;

158. SYG'S and Mr. Stratmann's breaches directly and proximately caused Contessa to suffer damages.

159. SYG'S and Mr. Stratmann's breaches also caused Contessa to suffer special damages in the form of having to pay third party vendors that SYG and Mr. Stratmann should have paid.

WHEREFORE, Contessa demands judgment against Mr. Stratmann and SYG for all damages including special damages plus cost interest and such other relief which this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Counter-Plaintiff demands a jury trial on all issues triable by jury.

Dated: October 31, 2023                    Respectfully submitted,

Moore & Company, P.A.
255 Aragon Avenue, 3rd Floor
Coral Gables, FL  33134
Telephone: 786-221-0600
Facsimile 786-2201-0601
michael@moore-and-co.com
cflitman@moore-and-co.com
*Counsel for Defendants/Counter-Plaintiff*
*M/V Octopussy and Contessa Marine Research LLC*

s/Caycie Flitman
Michael T. More, Esq.
Florida Bar No. 207845
Caycie Flitman, Esq.
Florida Bar No. 55826

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 31st day of October 2023, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of electronic filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

s/Caycie Flitman
Caycie Flitman, Esq.
Florida Bar No. 55826

## **SERVICE LIST**

Matthew J. Valcourt, Esq.
VALCOURT AND ASSOCIATES LLC
850 NE Third Street, Suite 208
Dania, FL 33004
Telephone: 305-763-2891
Facsimile: 305-470-7484
mvalcourt@valcourtlaw.com
*Counsel for Plaintiff/Counter-Defendant, Starboard Yacht Group LLC*