UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-61696-CIV-SINGHAL

STARBOARD YACHT GROUP LLC,

Plaintiff/Counter-Defendant,

vs.

CONTESSA MARINE RESEARCH, LLC,

Defendant/Counter-Plaintiff,

vs.

CHARLES JACOB STRATMANN,

Counter-Defendant.
_______________________________________/

**ORDER**

This is a relatively simple case that has now taken more than three years to resolve. Here, the Parties' relationship was based upon the repair and improvement of a luxury yacht and involved millions of dollars flowing one way. Having carefully considered the history of the case, the arguments and filings, and the trial session in this matter, the Court has seen similar occurrences particularly here in south Florida on Ponzi scheme cases. But that type of case is for the U.S. Attorney's Office to bring. Before the Court now, is a civil dispute relating to services, goods and payments.

On February 23, 2026, the Court held a one-day bench trial in this matter. The trial was abbreviated because Counter-Defendant Charles Jacob Stratmann ("Stratmann") did not appear after the lunch recess. This despite Defendant Stratmann specifically asking not only how long the lunch recess would be, but also what specific time Court would resume—2:07 p.m. (Trial Transcript (DE [312] at 127:18-20)). But when

Court resumed at 2:12 p.m.—five minutes after the specified time—Defendant Stratmann was not present. The Court and Counter-Plaintiff Contessa Marine Research, LLC ("Contessa Marine" or "Contessa") waited patiently. The Court even sent a law clerk and Courtroom Deputy to look for Stratmann throughout the courthouse, tasking them to make sure they included a visit to the bankruptcy court in case Stratmann was filing papers there. It should be noted that the undersigned's courtroom is the only one on the entry level floor of the Fort Lauderdale federal courthouse, and it would take approximately twenty seconds, walking slowly, to get from the metal detector to the courtroom door. Stratmann was nowhere to be found. After giving Stratmann fifteen extra minutes, proceedings continued, and Contessa Marine rested its case relying on what had been presented, and the admission of all their noticed and unobjected-to exhibits. The Court then concluded the trial, since Stratmann still had not appeared, and rather than simply entering judgment for Contessa Marine pursuant to case law and Rule 55, the Court stated that the parties could submit findings of fact and conclusions of law.

Only after court proceedings concluded did Stratmann reappear.[1] Stratmann had a ready excuse that he had been busy printing exhibits,[2] but all this should have been done well before trial started particularly in a case filed in 2023. And of course, Stratmann had not even properly filed an exhibit list. Stratmann explicitly asked when Court would

[1] Stratmann's alleged timeline makes no sense. He alleges that he returned to the courthouse at "2:07 p.m. approximately 28 minutes after the Court had already reconvened at 2:22 p.m." (DE [316] at 4). He was not at the courthouse at 2:07—that is when Court resumed—and, even after searching, he was nowhere to be found. Also, 2:07 p.m. comes before, not after, 2:22 p.m.

[2] Stratmann later filed a motion claiming that his printer jammed. This is just the latest of the many excuses that Defendant Stratmann has made. *See* (DE [312] 127:12) (Court: "Okay. You and your excuses."). Stratmann's reliance on excuses and his refusal to take accountability diminishes his credibility to the point that the Court cannot continue to extend grace when he fails to satisfy his commitments, like attending trial.

resume, but he did not appear. He did not call chambers.[3] The Court gave Stratmann an extra fifteen minutes before resuming trial, but still, he remained absent. Proceedings concluded at 2:30 p.m. (DE [312]) and Stratmann did not return.[4] If the Court were to give Stratmann yet another break—after giving him multiple already[5]—the Court would not only prejudice Contessa Marine, which came to trial prepared, but also fail to follow precedent. The Court instead will rely on the testimony and evidence presented at trial, the previously established record, and the papers. The Court has carefully considered the credibility of the witnesses presented and the evidence admitted during trial. When evaluating credibility, the Court considers Stratmann's decision to voluntarily absent himself part way through proceedings and his failure to produce any witnesses or evidence. *See Thelma C. Raley, Inc. v. Kleppe*, 867 F.2d 1326 (11th Cir. 1989) (concluding that district court properly drew adverse inference against party who failed to appear as witness). Pursuant to Fed. R. Civ. P. 52(a), the Court makes the following findings of fact and conclusions of law.

## I. BACKGROUND

The procedural history of this lawsuit is long and winding. The Court has previously compared this suit to Charles Dickens' legendary case *Jarndyce and Jarndyce*. The

---

[3] Later that afternoon, Stratmann did call chambers. Nothing prevented him from calling earlier if he was running late.

[4] In later filings, Stratmann attempts to explain why he was late for continuation of trial, but still says he arrived to Court on time. "Stratmann returned to the courthouse at approximately 2:07 p.m." (DE [316] at 4). This an excellent independent example of his inability to be truthful.

[5] Context is key here. Stratmann's tardiness alone does not prohibit him from exercising his right to his day in Court. Throughout this litigation Stratmann has proceeded as if the rules do not apply to him. Despite multiple warnings, he failed to obtain counsel for SYG, an LLC which must be represented by counsel. (DE [266]). Stratmann is now appealing *pro se* the entry of default judgment against SYG. *See* (DE [328]). Rather than obtaining counsel and appealing, Stratmann continues to act as if the rules do not apply to him. Before trial, Stratmann did not file any exhibits or witnesses by the deadline. Then on the morning of trial, he filed supplemental authority and newly discovered evidence. Stratmann's tardiness is simply the latest of many instances of acting as a law unto himself.

Court will not describe the entirety of the procedural history, but will only summarize the most salient points. This lawsuit is over an accounting for an open-book contract between Stratmann and Contessa Marine for Stratmann to make repairs on the vessel *M/V Octopussy*, a 1988 143' Heesen motor yacht bearing Registration Number JMP15060 (Jamaica) (the "Vessel").

Starboard Yacht Group, LLC ("SYG")—a single member LLC, with Stratmann as the sole member—initially sued Contessa Marine and the Vessel, alleging that Contessa Marine owed SYG over $2 million in back payments for work performed. (DE [1]). Contessa Marine counterclaimed against SYG and Stratmann, alleging that it had paid SYG $4,504,641.18, but SYG and Stratmann could only account for $1,476,646.46 of it. (DE [31]). Later on, SHM LMC, LLC ("LMC"), the marina housing the Vessel, intervened and sued both Contessa and SYG. (DE [61]). LMC's claims were resolved prior to trial. (DE [266]), [191]). After three separate lawyers withdrew from representing SYG and Stratmann, Stratmann decided to proceed *pro se*. But as an LLC, SYG cannot proceed *pro se* and needed to be represented. (DE [266]). The Court warned SYG multiple times that it must obtain counsel, (DE [247], [253]), but SYG never did. (DE [266]). The Court dismissed SYG's claims for failure to prosecute and granted default final judgment in favor of Contessa and LMC against SYG for failure to obtain counsel. (DE [266], [300]). That left Contessa Marine's counterclaim against Stratmann as the only cause of action remaining for trial.

The main issue at trial is whether Contessa Marine could pierce SYG's corporate veil and hold Stratmann personally liable for the judgment imposed against SYG. For the reasons set out below, the Court concludes that Stratmann is indeed personally liable for

the entire judgment against SYG. The Court recognizes that Stratmann is also independently liable to Contessa Marine for several torts—namely fraud, conversion, negligent misrepresentation, and breach of fiduciary duty. The Court makes the following findings of fact and conclusions of law concerning Contessa's claims against Stratmann. To the extent any finding of fact constitutes a conclusion of law, it is adopted as such, and to the extent any conclusion of law constitutes a finding of fact, it is adopted as such.

## II. FINDINGS OF FACT

### A. The Parties

Contessa Marine is a Delaware limited liability company and is the registered owner of the Vessel.[6] SYG is and was a Florida limited liability company with its principal place of business located at 850 NE Third Street, Suite 208, Dania Beach, Florida 33004. Contessa Marine retained SYG to act as project manager for the refit of the Vessel. SYG is no longer a party to this lawsuit following the entry of Final Default Judgment (DE [299], [300]). Stratmann is a citizen of the United States and of the state of Florida. Stratmann is the principal, manager, founder, and sole managing member of SYG. (DE [312] at 5:24-25) ("I am a single-member LLC . . . .").[7]

### B. The Project Management Relationship

In 2022, Contessa Marine retained SYG, acting through Stratmann, to serve as project manager for the refit of the Vessel. The parties' contract was structured as an open-book, cost-basis project management agreement. Under that arrangement, Contessa Marine agreed to pay SYG a project-management fee of $3,000.00 per week

[6] The Vessel is no longer a party to this lawsuit.
[7] Although Stratmann never testified, the statements he made at trial as a *pro se* litigant are admitted as opposing party's statements made in an individual capacity. Fed. R. Evid. 801(d)(2).

in exchange for Stratmann's project management services. Apart from the weekly management fee, Contessa Marine agreed to fund pre-approved project costs at cost basis, including vendor costs, equipment purchases, and subcontractor expenses associated with the refit. Total budget for the project was limited to $4,000,000.00. The refitting project was expected to be completed by July 2023, or about twelve to fourteen months from the start. SYG, acting through Stratmann, was to prepare a refit budget, develop a scope of work and priority list, find and recommend vendors, organize vendor contracts and pricing, review those matters with Contessa Marine, negotiate pricing, perform the work on an open-book basis, coordinate with and oversee vendors, and keep accounting records. SYG, acting through Stratmann, needed authorization from Contessa Marine to alter the scope of the project.

Even though Contessa Marine contracted with SYG, Stratmann controlled everything SYG did, starting with the money. Stratmann individually requested the funding amounts wired by Contessa Marine and was responsible for the management, disbursement, and accounting of those project monies. Stratmann controlled the funds received from Contessa Marine, was an authorized signatory on the SYG accounts used to receive and disburse those funds, and was the individual authorized by SYG to direct the payment and allocation of Contessa Marine's funds earmarked for specific project purposes. Stratmann maintained exclusive control over all funds received from Contessa Marine in connection with refitting the Vessel. During the trial, Stratmann stated "they're making it an accounting case, trying to come down and pierce this, ***which I welcome openly because . . . I personally guarantee all my debts***." (DE [312] at 32-33).

Stratmann admitted direct and personal control of the financial transactions at issue in this trial.

Stratmann also exercised complete control over the refitting project. In his own papers, Stratmann expressly averred that he "personally managed the [Vessel] refit project," "[o]versaw all financial operations through [] accounting software," "[w]as present for and participated in every [material] event," "[e]xecuted every contract, supervised every employee, and approved every expenditure at issue." (DE [292] at 2). These admissions establish that Stratmann exercised exclusive and entire control over all aspects of the Vessel refitting project. He exercised actual control over planning the Vessel refit, budgeting, funding requests, communications relating to the Vessel, vendor payments, and invoicing pertaining to the Vessel refit.

Finally, Stratmann was the public face of SYG. Not only did he personally communicate with Contessa Marine, but also he personally communicated with third-party vendors concerning the purchases and services associated with the refit. He was not just the behind-the-scenes controller but was in fact SYG.

C. The Funding Structure, Stratmann's Fiduciary Role, and Contessa Marine's Reliance

This open-book contract model between Contessa Marine and Stratmann depended on trust. Stratmann would personally request funds, as he allegedly needed them, from Contessa Marine via email. Contessa Marine's representative, Steven Ivankovich, testified at trial that Contessa Marine would wire Stratmann the requested amounts. Stratmann never sent invoices. Contessa Marine did not have independent access to vendor contracts, vendor ledgers, or vendor payment records relating to the project. Instead, Stratmann would just ask for more funds, which Contessa would

provide. As Mr. Ivankovich testified, Contessa Marine entered into this high-trust funding arrangement because it justifiably believed that Stratmann was requesting only amounts that were actually due to vendors, and that those funds would be applied as represented, directed, and approved for legitimate project expenses.

The Court finds that such reliance was objectively reasonable and justifiable under the circumstances.[8] Stratmann acted as project manager and financial intermediary for the project, exercised exclusive control over the relevant vendor communications and financial information, and affirmatively represented himself as acting in Contessa Marine's best interests with transparency and honesty. In this type of relationship, such reliance was justified. The Court further finds that Contessa Marine did not have access to independently review vendor contracts or vendor payment obligations during the relationship. Instead, Contessa Marine reasonably relied on Stratmann's funding requests and representations concerning what was due and how Contessa Marine's funds would be allocated. Further, Stratmann knew Contessa Marine would rely upon his representations when it was transmitting funds.

Stratmann represented himself as trustworthy time and again to Contessa Marine. On May 24, 2022, Stratmann wrote: "Wanted to show some transparency as we are the PM role onboard Octopussy . . . look forward to having more visibility and working with your team by bringing more assets, value, and accountability." (DE [197-1] at 1). On May 25, 2022, Stratmann wrote to a third party that he was "representing the best interest of Octopussy and the current owner." (DE [197-3] at 1-2). On March 1, 2023, Stratmann

[8] An interesting note on reliance. At trial, despite the obvious now adversarial relationship of the Parties and certain witnesses, many greeted each other like acquaintances at a restaurant. The yachting industry in south Florida is very much trust, relationship, and handshake based.

told Contessa Marine that "Truth is the Right answer is our 1st core value." (DE [197-4] at 1). He also thanked Contessa Marine for their trust and commitment in SYG. *Id.* The Court finds that these representations reinforced Contessa Marine's trust in Stratmann and induced Contessa Marine to rely on Stratmann's funding requests and representations regarding the application of Contessa Marine's funds designated for project costs.

D. <u>The Money Transferred by Contessa Marine</u>

Testimony and documentary evidence presented at trial established that between April 8, 2022, and March 31, 2023, Contessa Marine wired a total of $4,504,641.18 to SYG in connection with the Vessel refit. (DE [309-2]). *See also* (DE [287-1] at 6). Those monies belonged to Contessa Marine, not Stratmann, and the funds were transmitted in reliance on Stratmann's representations regarding how the funds would be allocated and applied to project expenses and vendor obligations. The evidence at trial showed that by March 31, 2023, Stratmann had still not finalized a budget, created a design plan, or produced a build schedule, but Contessa Marine had paid Stratmann and SYG $3,504,640.42. On March 31, 2023, Contessa Marine transmitted an additional $1,000,000.00 wire to Stratmann. (DE [309-2]). At trial, Contessa Marine's representative credibly testified that the final wire was transmitted in reliance on Stratmann's own spreadsheet and his representation that Contessa Marine still owed $922,728.43. Contessa Marine wanted to ensure there would be no issues with underfunding, and thus paid more than the alleged $922,728.43 remaining balance.

The Court finds that Contessa Marine reasonably relied on Stratmann's spreadsheet and funding requests when wiring money, including the final payment of

$1,000,000.00 on March 31, 2023. The Court further finds that, according to Stratmann's own accounting, Contessa Marine's March 31, 2023, payment zeroed out any then-claimed balance and left a surplus.[9] Finally, the Court finds that the funds wired by Contessa Marine were specifically earmarked and entrusted project funds that Stratmann was required to apply to project expenses and account for how they were spent.

E. Stop-Work Order, Audit, and Missing Records

By March 2023, despite millions of dollars having been transferred in response to Stratmann's funding requests, Stratmann had done little to show for it. Contessa Marine then requested an accounting of how its funds had been spent on the Vessel. Stratmann could not provide records showing how he had applied all of Contessa Marine's funds. On March 23, 2023, after Contessa Marine determined that Stratmann could not satisfactorily show how its funds had been spent, Contessa Marine ordered SYG and Stratmann to stop all work on the Vessel so an audit could take place to determine where Contessa Marine's money had gone.

Even after the audit began, Stratmann still refused to provide a transparent open-book accounting for Contessa Marine's funds. Instead, Stratmann scrambled and produced Repair Orders, allegedly indicating the work done, payments made, and payments owed. (DE [1-1]). But perhaps most significantly, seemingly in response to having to answer Contessa Marine's reasonable requests for transparency and an accounting of where millions of dollars went, Stratmann sued Contessa Marine rather than complying. (DE [1]). Having reviewed the Repair Orders, the Court determines they are not credible. For example, Invoice 40590 double bills for a technician's time for hours

[9] This finding stands in contrast to SYG's initial claim—which began this odyssey of a lawsuit—that Contessa Marine owed SYG millions of dollars.

included on Invoice 40539. Invoice 40539 indicates that Technician "derb" had "Remove[d] all Kamewa Equipment" on February 15, 2023, from 8:23-9:46. (DE [197-5] at 3). The entire total for labor for Invoice 40539 was $18,010.00. *Id.* at 1. But Invoice 40590 lists Technician "David M Erb" as having "Remove[d] engine room equipment" on February 15, 2023, from 8:22 to 4:00. *Id.* at 10. The entire labor total for Invoice 40590 was $23,480.00. *Id.* at 9. "derb" and "David M. Erb" are clearly the same technician. And on the invoices, this technician billed for two different tasks at the same time. That is simply not credible. It is not as if this technician took a break from one task and worked on the other. Instead, both invoices bill for that entire time slot. SYG was submitting fraudulent Repair Orders. The Court finds that the Repair Orders are not credible evidence of what work was actually performed.[10]

Stratmann failed to produce any other documentation to support his claim that all the funds were used for the project. During discovery, Contessa Marine repeatedly requested financial records showing how project funds were spent. Stratmann had sole possession, custody, and control of and access to those records. Despite years of litigation, multiple motions, and hearings, Stratmann failed to produce a complete and reliable accounting showing the disposition of the $4,504,641.18 transferred in connection with the Vessel refit. Magistrate Judge Valle previously addressed these discovery failures and recommended an adverse inference at trial regarding the missing financial records. (Hearing Trans. (DE [233] at 71:10-13)). The Court finds that the missing records, if they exist, would have been unfavorable to Stratmann and SYG.

[10] This finding includes Buyers Order 5008 (DE [1-1]). Buyers Order 5008 suggests that Contessa Marine owed SYG and Stratmann $2,033,483.48. But as discussed earlier, Contessa Marine does not owe Stratmann and SYG anything. Contessa Marine paid everything that Stratmann requested.

Otherwise, Stratmann would have produced them. The absence of those records indicates that substantial portions of Contessa Marine's money were not applied as represented and cannot be reconciled because they were misapplied, diverted, or otherwise misappropriated.

The Court finds that instead of funding the project via payment of invoices, like the Repair Orders might suggest, Contessa Marine funded the project as Mr. Ivankovich credibly testified at trial—by sending funds when requested directly to Stratmann and SYG, in an open-book format. And Stratmann cannot show these funds were properly used; rather, the funds were misappropriated.

F. Unsubstantiated Funds

While Contessa Marine wired Stratmann $4,504,641.18 in connection with the Vessel refit, the Court can only identify approximately $1,476,646.46 that were applied to verified project expenses. (DE [309-2]); (Affidavit of Neil Burell (DE [288-1])). [11] The

[11] Mr. Burell is a CPA and forensic accountant with 30 years of experience. (DE [288-1] ¶ 2-3). Mr. Burell was originally engaged to perform a financial tracing and reconciliation analysis designed to determine, among other things: (a) the total funds transferred from Contessa Marine to Stratmann and SYG; (b) the amounts paid to third-party vendors in connection with the Vessel's refit; and (c) other financial observations concerning the accounting practices reflected in the available records. Mr. Burell's assignment was to determine whether the funds remitted by Contessa Marine could be traced to legitimate, identifiable project expenditures or whether the available records demonstrated that the funds had been misapplied, diverted, or otherwise could not be substantiated through vendor documentation or accounting records. In performing his forensic analysis, Mr. Burell reviewed numerous categories of financial and project documentation, including but not limited to wire transfer confirmations, bank records, repair orders generated by SYG, third-party vendor invoices and statements, subpoena responses from vendors, payment records, funding requests, email correspondence, and related accounting materials. Mr. Burell's reconciliation consisted of identifying the total funds transferred from Contessa Marine, matching those transfers to vendor invoices and payment confirmations where available, confirming vendor receipt of funds through third-party documentation, identifying discrepancies between Stratmann's representations and actual payments, and calculating unpaid balances and diverted or unsubstantiated amounts. Stratmann objects to Mr. Burell's report. (DE [290]). To the extent Stratmann objects to Mr. Burell's forensic analysis of the funds and how they were disposed of, Stratmann's objections are overruled. Stratmann raises no legitimate objections to Mr. Burell's qualifications, processes, or finding that $3,027,994.72 could not be substantiated. The Court sustains in part Stratmann's objections to Mr. Burell's findings of total damages, because Mr. Burell's total damages do include some double damages. But Mr. Burell's findings of double damages does not reduce Mr. Burell's overall credibility, especially in regard to unsubstantiated funds, because his findings of unsubstantiated funds were supported by evidence produced at trial.

analysis completed by Neil Burell is uncontroverted. The Court has of course done it's own independent calculation of the amounts in question and ultimately finds that while Stratmann owes Contessa millions, it is a slightly lower amount than that calculated by Burell. The funds that Contessa Marine transferred to Stratmann did not belong to Stratmann and were transmitted based on his representations regarding how those funds would be allocated and remitted for restoration of the Vessel. These were not general business payments to which Stratmann had unrestricted entitlement; rather, they were project funds entrusted to Stratmann for specific pre-approved restoration costs based on Stratmann's funding requests and representations. The Court finds that $3,027,994.72 of Contessa Marine's funds remains unsubstantiated and unaccounted for. The Court examines in detail some of the categories of these missing funds.

1. <u>MTU Engines</u>

Stratmann requested funds from Contessa Marine to purchase MTU engines from Florida Detroit Diesel-Allison ("FDDA"). According to Stratmann's own records and representations, the total amount for the MTU engines was $1,825,000.00. (DE [309-1]). Contessa Marine was not shown the contract, but instead relied on Stratmann's representations and funding requests. Stratmann requested $942,500.00 for the MTU engines and represented that those funds would be remitted to FDDA. In two payments, Contessa Marine transmitted $950,000.00 to Stratmann to be remitted to FDDA as the initial deposit required to begin building the engines. (DE [309-2]), [312] at 117-118). Stratmann's own records represented that $942,500.00 had been applied to FDDA and that only an additional $532,500.00 remained due and owing (DE [309-3]) (Stratmann's

funding request spreadsheet).[12] But as FDDA's corporate representative testified at trial and as shown by FDDA's records, Stratmann in fact remitted only $638,750.00 to FDDA, despite Stratmann's representations to the contrary. (DE [309-1]). On March 31, 2023, Contessa Marine paid the remainder of the budgeted engine cost to Stratmann in the amount of $532,500.00. (DE [312] at 79–83; 118:15–25).[13]

Contessa Marine transmitted those engine-related funds in reliance on Stratmann's representations regarding how the funds would be allocated and remitted as represented. These funds belonged to Contessa Marine, not Stratmann, and they were only entrusted to him for a specific project purpose. But Stratmann failed to produce any accurate and authentic documentation, showing where the funds for the MTU engines went. The testimony and subpoena production from FDDA established that Stratmann lied when he told Contessa Marine that he applied all the funds to the sale of the MTU funds. In total, Stratmann failed to apply $836,250.00 to the purchase of the engines.[14] To date, no one, other than Stratmann, knows where those funds are.

Because Stratmann did not apply the entrusted funds as he said he would, Contessa Marine still owed FDDA $1,016,242.50 for the engines. Contessa Marine then paid the remainder directly to FDDA but still has not received the engines.[15] The Court

---

[12] Of course, $950,000.00 plus the requested $532,500.00 does not add up to the $1,825,00.00 invoice. Instead, it adds up to $1,482,500.00. Why Stratmann was requesting less money than was owed for the invoice is unclear. It may be part of the "magic of this case." (DE [312] at 33:7). What is clear is that Stratmann "pocketed [some of] the money" that Contessa Marine transmitted to him for the engines. (DE [312] at 119:6).

[13] Mr. Ivankovich testified at trial that Stratmann also represented that he would sell the Vessel's old engines for approximately $550,000.00 to $650,000.00. The evidence established, however, that Stratmann never sold the Vessel's old engines.

[14] On top of the $638,750.00 that Stratmann did remit to FDDA, Contessa Marine paid Stratmann $836,250.00 that Stratmann did not apply to the engines (the $942,500 paid to Stratmann minus the $638,500 Stratmann actually paid FDDA, plus the $532,500 Contessa Marine paid Stratmann as part of the final $1,000,000 payment).

[15] Contessa Marine has not received the engines yet because about $200,000 is still owed for taxes and storage fees. Contessa Marine is not seeking these monies as damages.

finds that Contessa Marine's direct payment to FDDA in the amount of $1,016,242.50 constitutes a double payment caused by Stratmann's misrepresentation and misapplication of entrusted project funds.

The Court finds that Stratmann personally requested funding for the MTU engines, personally controlled the accounts receiving the funds designated for the MTU engines, personally directed the disbursement of those funds, and personally refused to remit those funds to FDDA, causing Contessa Marine's double payment to FDDA. Stratmann's misrepresentations were not corporate abstractions—they were personal attestations made by the person who controlled the funds and refused to follow through. As Mr. Ivankovich testified at trial—"[Stratmann was] pocketing money and misrepresenting the amounts in the spreadsheet." (DE [312] at 113:15-16).

2. <u>Voith Linear Jets</u>

Stratmann, through SYG, executed a purchase order with Voith US Inc. ("Voith") for the purchase of Voith Linear Jets for the Vessel, for a total of $495,000.00. Contessa Marine did not see the Voith contract and instead relied on Stratmann's representations and funding requests as to what was owed. Stratmann requested $150,000.00 from Contessa Marine and represented that the funds would be remitted to Voith as the initial deposit. Contessa Marine provided Stratmann the $150,000.00. But Stratmann only transmitted $148,500.00 to Voith. (DE [288-1] ¶ 30). Stratmann later requested a second deposit in the amount of $250,000.00. In reliance on those representations and in accordance with Stratmann's funding requests, on or about March 31, 2023, Contessa Marine transmitted an additional $250,000.00 (as part of the $1,000,000.00 final payment) to satisfy the Voith balance according to Stratmann's

own records. (DE [312] at 88:1-5). Contessa Marine entrusted Stratmann with these funds for the specific purpose of paying Voith for the Vessel's linear jets.

Mr. Ivankovich testified that subsequent investigation and subpoena production from Voith revealed that Stratmann had not paid Voith all the funds that Contessa Marine had entrusted to Stratmann. Stratmann never remitted the $250,000. *Id.* at 88:7-16. Contessa Marine had to pay the remaining amount due under the contract—$346,500—to Voith directly. (DE [312] at 39); (DE [288-1] ¶ 33).[16] This was on top of the funds that Contessa Marine had already paid Stratmann.

The Court finds that Stratmann's representations concerning the application of the Voith funds were false. Because the entrusted funds were not applied as represented, Contessa Marine was again forced to pay twice and remit the balance of $346,500.00 directly to Voith. The Court further finds that the difference between what Stratmann requested and represented as applied to Voith for the jets and what was actually remitted, $251,500.00, constitutes additional evidence of Stratmann's misapplication of specific entrusted funds. The Court finds that this conduct aligns with Stratmann's pattern of mishandling funds: Stratmann requested funding under false pretenses; Contessa Marine wired the money, reasonably relying on Stratmann's representations; the vendor remained unpaid despite Stratmann's receipt of funds; and Contessa Marine was forced to pay the vendor directly, resulting in double payment and quantifiable damages. The Court finds that Stratmann personally and intentionally

[16] It is unclear from both the record and evidence presented at trial whether Contessa Marine ever received the Voith Jets. Because the Counter-Plaintiff bears the burden of proof, the Court construes this ambiguity in favor of Counter-Defendant Stratmann. Accordingly, the Court considers Contessa Marine to have received the Voith Jets after paying the remaining $346,500. Contessa Marine had to pay twice for a product, so its damages are the monies that it paid initially when it did not receive the product. The second payment, the $346,500, was simply the cost of the product received.

directed the funding requests, exercised exclusive control over the accounts receiving the Voith funds, exercised exclusive control over the disbursement of those funds, and personally and knowingly refused to pay Voith, causing Contessa Marine's double payment to Voith.

3. Seakeeper Units

Stratmann urged Contessa Marine to purchase three (3) Seakeeper stabilizer units ("Seakeepers") for the Vessel from Seakeeper Inc.; Stratmann stressed that the Seakeepers were necessary and could be obtained at favorable pricing. (DE [312] at 93:2-3). Stratmann requested $793,002.00 from Contessa Marine for the purchase of three Seakeeper stabilization units, and Contessa Marine wired a total of $827,699.42 to Stratmann. *Id.* at 96-97. Contessa Marine did not see the Seakeeper purchase contract and instead reasonably relied on Stratmann's representations and funding requests as to what was due. Contessa Marine's reliance was justified given the project management relationship and Stratmann's superior knowledge and control over vendor relationships, especially since Stratmann was an experienced Seakeeper dealer. According to the credible testimony and Stratmann's own records, Stratmann affirmatively represented that $793,002.00 had been remitted to Seakeeper for the purchase of the three units to be installed on the Vessel. But Stratmann never installed the units. Instead, he returned one to Seakeeper, sold another, and is actively trying to sell a third. (DE [312] at 86). Stratmann failed to perform what he said he would do, and instead, he profited from the sale and refund of the Seakeepers that he had obtained with Contessa Marine's monies.[17] None of the three Seakeeper units purchased with Contessa Marine's funds were

[17] Stratmann received $170,004.20 in refund from Seakeeper for one unit, and sold the other for $192,068.00, personally netting a total of $362,072.20 from Contessa Marine's funding. (DE [288-1] ¶ 19).

delivered to Contessa Marine or installed on the Vessel, despite Stratmann's receipt of full payment and his representations that the units would be provided for the Vessel's benefit. Instead, Stratmann profited, or is attempting to profit, from each Seakeeper. The Court finds that Contessa Marine paid for Seakeeper equipment it never received and, as a result, suffered the loss of $827,699.42. *See id.* at 96:16-97:2. The Court finds that Stratmann personally requested funds from Contessa for the Seakeepers, personally controlled the accounts receiving those funds, personally chose to not install the Seakeepers as he had agreed to do, personally directed the disposition of the Seakeeper units, and personally retained or directed the retention of the resulting proceeds.

4. <u>LMC Chargebacks</u>

The evidence also established that Contessa Marine funded charges relating to LMC and related yard expenses. Pursuant to Stratmann's funding requests and based on Stratmann's own self-created records, Contessa Marine funded SYG to pay LMC for dockage and yard services relating to the Vessel. Based on Stratmann's own records, Contessa Marine funded Stratmann $458,375.16 for storage fees. (DE [309-3]). Contessa Marine funded Stratmann to pay LMC in reliance on Stratmann's representations concerning what was due and how the funds would be applied. Contessa Marine did not independently examine LMC's invoices, but instead relied on Stratmann's representations. For once, it appears Stratmann may have actually paid the total monies he received from Contessa Marine to LMC. But of course, Stratmann had other ways of skimming off the top. He then initiated credit card chargebacks amounting to $226,502.19, which he pocketed. (DE [288-1] ¶ 36-39). Stratmann did not return the chargeback monies to Contessa Marine, even though those funds belonged to Contessa

Marine. Contessa Marine was deprived of $226,502.19 of its own funds, which Stratmann obtained wrongfully via chargebacks. LMC then sued Contessa Marine for the monies that were charged back, and Contessa Marine has suffered damages from defending this lawsuit, which was only prompted by the actions of Stratmann. Contessa Marine also had to pay LMC directly, resulting in yet another double payment. *See* (DE [312] at 90) ("[T]o release the boat, subsequently, we did pay Lauderdale Marine Center directly.").

The Court finds that the $226,502.19 represents money entrusted for a specific project purpose that was not ultimately applied or returned to Contessa Marine. The Court further finds that Stratmann's personal actions—requesting funds and initiating unauthorized chargebacks—forced Contessa Marine to pay twice for docking related expenses and participate in litigation and settlement efforts with LMC.

5. <u>Other Unsubstantiated Funds</u>

These four categories of misappropriated funds—the MTU engines, Voith jets, Seakeepers, and chargebacks—do not constitute the entirety of the misplaced funds. These funds constitute $2,141,951.61. But the evidence at trial demonstrated that Stratmann cannot account for $3,027,994.72. *See* (DE [309-2]). Rather than being the entirety of the misplaced monies, these four categories show the process by which Stratmann requested funds for specific projects, received the funds, misappropriated the funds, and then failed to show where the funds went. The evidence shows Contessa paid the monies to Stratmann, the funds were not used to improve Contessa's Vessel, and Stratmann cannot credibly account for the disposition of the funds. Because Stratmann cannot show where the additional $886,043.11 went—on top of the $2,141,951.61

earmarked for the four previously discussed categories—the only logical conclusion is that Stratmann misused these monies in the same way.

G. <u>Vendor Communications and Concealment</u>

Not only did Stratmann wrongfully obtain and hold on to Contessa Marine's funds, but he also bullied vendors and kept them from communicating with Contessa Marine. The Court credits the testimony of Mr. Ivankovich that, when Contessa Marine later attempted to determine what had actually been paid and what remained unpaid, vendors initially refused to communicate directly with Contessa Marine because their contractual relationships were with SYG. Mr. Ivankovich testified that Stratmann had threatened the vendors with litigation if they spoke directly with Contessa Marine. (DE [312] at 85:13-15). Only through counsel and continued effort was Contessa Marine finally able to communicate directly with vendors and determine what had actually been paid and on what basis.

The Court finds that this evidence is consistent with a pattern of concealment and inconsistent with the transparency required by an open-book project-management arrangement. The Court further finds that Stratmann's intimidation of vendors is consistent with his repeated personal control over the vendor relationships, the project funds, and the information necessary to account for those funds. The Court finds that Stratmann used his control over SYG, vendor relationships, and project information to prevent Contessa Marine from learning the true status of vendor payments during the project.

H. Summary of Findings

In summary, the Court finds that Stratmann exercised complete operational and financial control over SYG and over the project funds transmitted by Contessa Marine. Stratmann's admissions and trial conduct are consistent with his personal and total control over the transactions at issue and inconsistent with any argument that he acted merely as a passive representative of SYG. Stratmann personally requested the funding transfers, personally represented how those funds would be applied, personally controlled the accounts receiving those transfers of funds, personally approved expenditures, personally directed the disposition of the received funds, and personally controlled the records necessary to account for those expenditures. Contessa Marine reasonably relied on Stratmann's funding requests and allocation representations when transferring monies, and Stratmann failed to maintain or produce a reliable open-book accounting of the funds Contessa Marine entrusted to Stratmann for specifically identified project costs. Substantial portions of the funds transferred to Stratmann by Contessa Marine—millions of dollars of those funds—were not applied as represented and remain unaccounted for. Stratmann made false representations regarding vendor payments, project balances, and the allocation of project funds. As a result, Contessa Marine suffered damages from conduct personally directed and carried out by Stratmann.

III. CONCLUSIONS OF LAW

In reaching the conclusions set forth below, the Court has considered the entire evidentiary record, including the testimony presented at trial, the documentary evidence admitted into the record, the parties' written submissions, and the reasonable inferences drawn therefrom. In this case, based upon Stratmann's decision to abandon trial even

though his opposition had prepared and appeared, the Court could have simply entered judgment for Contessa Marine under the text of Fed. R. Civ. P. 41(b) and 55 and the cases interpreting those rules in the context of a Party's abandonment of trial and the resulting prejudice to the opposition. The extra judicial labor and preparation of this Order serve only to delineate what Stratmann owes and why.

A. Jurisdiction, Venue, and Governing Maritime Law

This action is governed by the general maritime law of the United States. This Court possesses admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1). That jurisdiction extends to "all contracts . . . which relate to the navigation, business, or commerce of the sea." *Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 199 (2d Cir. 1992) (quoting *DeLovio v. Boit*, 7 F. Cas. 418, 444 (C.C.D. Mass. 1815) (J. Story)). Contracts for repairs of vessels fall under the jurisdiction of the federal courts. *Hatteras of Lauderdale, Inc. v. Gemini Lady*, 853 F.2d 848, 849-50 (11th Cir. 1988).

Stratmann's initial action was pled under admiralty jurisdiction, (DE [1] ¶ 1-2), and the Court possesses supplemental jurisdiction over Contessa Marine's compulsory counterclaims pursuant to 28 U.S.C. § 1367(a) and Rule 13 of the Federal Rules of Civil Procedure. (DE [31]). "[B]ecause the Court has original subject matter jurisdiction over the [initial] claim under its admiralty jurisdiction, the Court can and does choose to exercise supplemental jurisdiction" over Contessa Marine's tort claims because Contessa Marine's claims "are so related to claims in the action within the Court's original jurisdiction, they form part of the same case or controversy." *Chartis Prop. Cas. Co. v. Frenchman's Marina Resort, Ltd.*, 2015 WL 12723104, at *5 (S.D. Fla. Jan. 16, 2015).

Venue is proper in this District because Stratmann engages in substantial activity in this District, including vessel repair, and all alleged services and "necessaries" were provided to the Vessel in this District at the time the causes of action accrued.

"With admiralty jurisdiction comes the application of substantive admiralty law." *East River S.S. Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 864–65 (1986). "Absent a relevant statute, the general maritime law, as developed by the judiciary, applies." *Id. See also United States v. Reliable Transfer Co.*, 421 U.S. 397, 409 (1975); *Knickerbocker Ice Co. v. Stewart*, 253 U.S. 149, 160–161 (1920). When maritime law applies, federal courts may draw upon maritime precedent and general common-law principles when resolving tort claims arising from maritime contracts. *See East River S.S. Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 864–65 (1986); *see Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 23 (2004) (federal common law applies to cases that arise under admiralty jurisdiction.). If federal common law principles and maritime law run out, courts sitting in admiralty may look to state common-law principles that are consistent with maritime law. *See Willis v. Royal Caribbean Cruises, Ltd.*, 77 F.4th 1332, 1338 (11th Cir. 2023) ("Without a controlling maritime principle, as is the case here, 'courts may apply state law provided that the application of state law does not frustrate national interests in having uniformity in admiralty law.'") (quoting *Coastal Fuels Mktg., Inc. v. Fla. Express Shipping Co., Inc.*, 207 F.3d 1247, 1251 (11th Cir. 2000)).

Here, the Court applies substantive admiralty law, even though Contessa Marine alleged supplemental jurisdiction. If an action is filed under diversity jurisdiction but could be sustained under admiralty jurisdiction, admiralty law may still apply as substantive law. *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 23 (2004) ("This suit was properly brought in

diversity, but it could also be sustained under the admiralty jurisdiction by virtue of the maritime contracts involved . . . . Indeed, for federal common law to apply in these circumstances, this suit *must* also be sustainable under the admiralty jurisdiction."). First, the cause of action must be able to have been filed under admiralty jurisdiction initially. *Id.* Second, the dispute must not be "inherently local." *Id.* at 27. "A maritime contract's interpretation may so implicate local interests as to beckon interpretation by state law. . . . But when state interests cannot be accommodated without defeating a federal interest, as is the case here, then federal substantive law should govern." *Id.* For this second element, courts ask if "applying state law . . . would undermine the uniformity of general maritime law." *Id.* at 29. "When 'a [maritime] contract . . . may well have been made anywhere in the world,' it 'should be judged by one law wherever it was made.'" *Id.* (quoting *Kossick v. United Fruit Co.*, 365 U.S. 731, 741 (1961)).

Both elements of the *Kirby* test are met here. First, Contessa Marine's counterclaim could have been brought under admiralty law. The Counterclaim is raised in response to a Complaint filed as an admiralty action under Federal Rule of Procedure 9(h). And even though Contessa Marine raised contract and tort claims, and alleged supplemental jurisdiction, not admiralty, the caption of Contessa Marine's Counterclaim states this is an admiralty case. (DE [31] at 1). Contessa Marine's claims are contract and tort claims involving the repair of a vessel—quintessential admiralty claims. *See Hatteras,* 853 F.2d at 849-50. Contessa Marine's Counterclaims could have been brought under admiralty jurisdiction instead of supplemental jurisdiction.

Turning to the second prong of the *Kirby* test, the contractual relationship between Contessa Marine and Stratmann for repair of the Vessel is not a strictly local affair. At

one point in their relationship, the parties sailed to the Bahamas together. (DE [312] at 122-24). The Vessel at issue is currently located in Dubai, still carrying the engines that Stratmann agreed to replace. (DE [106]). The facts in this case have taken place all over the world. It is not obvious that the contractual agreement at issue was formed in Florida—it could have been formed anywhere in the world. *See Kirby*, 543 U.S. at 29 ("When 'a [maritime] contract . . . may well have been made anywhere in the world,' it 'should be judged by one law wherever it was made.'"). Even to the extent there are local elements to some of Contessa Marine's claims, they all involve maritime elements. Trying to ascertain at what points in time Florida law should control and when maritime law should control would result in uneven interpretations of the parties' contract, as well as requiring different standards for fraudulent acts. Article III grants federal courts admiralty jurisdiction to promote uniform application of the laws. *Id.* at 28. Applying state law here will create unequal application of the law. Accordingly, the Court applies the general maritime law of the United States to the claims asserted by Contessa Marine against Stratmann.

B. Piercing the Corporate Veil

After the Court entered default judgment against SYG, (DE [300]), the remaining issue in this case is whether Stratmann may be held personally liable for the conduct giving rise to the judgment against SYG. The evidence presented in this case overwhelmingly demonstrates that SYG operated as the alter ego of Stratmann with respect to the conduct at issue.

"To determine whether to disregard the corporate form in an admiralty case, we apply federal common law." *Daughtry v. Jenny G. LLC*, 703 Fed. Appx. 883, 886 (11th

Cir. 2017). "Ordinarily, a creditor has recourse only against the corporate entity incurring the liability, not against parent corporations, stockholders, or other parties connected with the entity but under exceptional circumstances we may disregard the corporate form where the principal uses the corporation to perpetrate a fraud on investors or used a closed corporation as his personal business conduit." *Id.* (citation modified). "To justify the extraordinary step of holding the dominant party liable, the jury must find that this control amounts to total domination of the subservient corporation, to the extent that the subservient corporation manifests no separate corporate interests of its own and functions solely to achieve the purposes of the principal." *Id.* at 886-887 (citation modified).

The process of passing over the corporate structure and passing liability onto the dominant party is referred to as "pierc[ing] the corporate veil." *Id.* at 886. Piercing the corporate veil is not itself an independent cause of action, but is instead a means of imposing liability on an individual for the debts or acts of the corporation. *Peacock v. Thomas*, 516 U.S. 349, 354 (1996). Another way of describing piercing the veil is that courts hold the dominant party liable when they are actually the alter ego of the corporate entity. *Eitzen Chem. (Singapore) PTE, Ltd. v. Carib Petroleum*, 749 Fed. Appx. 765, 770 (11th Cir. 2018). The party attempting to pierce the corporate veil bears a significant burden to show the dominant party is the alter ego of the corporate entity. *Id.*

"There is no uniform standard test under federal common law for determining whether an alter ego relationship exists, and courts must instead look to the totality of the circumstances." *Id.* This analysis is fact-intensive. *Id.* The first step is to determine whether the dominant party's "control amounts to total domination of the subservient

corporation, to the extent that the subservient corporation manifests no separate corporate interests of its own and functions solely to achieve the purposes of the [principal]." *Daughtry*, 703 Fed. Appx. at 887; *Eitzen*, 749 Fed. Appx. at 770 ("[A] finding of control or domination of a corporation by an individual or a corporate entity and the use of the corporate fiction are necessary prerequisites to the application of the alter ego theory of liability.") (quoting *Talen's Landing, Inc. v. M/V Venture, II*, 656 F.2d 1157, 1161 n.6 (5th Cir. 1981)). "Once that is established, 'it is appropriate to brush aside the corporate veil when it appears a corporation was organized for fraudulent purposes, illegality, or wrongdoing.'" *Id.* (quoting *Talen's Landing*, 656 F.2d at 1161 n.6).

The evidentiary record amply satisfies each element required under federal maritime law to pierce SYG's corporate veil and hold Stratmann personally liable. First, Stratmann completely controlled and dominated SYG to the point that its separate corporate structure was functionally nonexistent with respect to the vessel refit project and the conduct at issue. Stratmann is the founder, CEO, and sole managing member of SYG. Stratmann admits that he personally managed the vessel refit, oversaw all financial operations, executed contracts, supervised employees, and approved expenditures.

As the evidence at trial shows, Stratmann personally requested the funds wired by Contessa Marine, controlled the bank accounts into which those funds were deposited, solely maintained the accounting records relating to the project, and personally directed vendor payments and project expenditures. Stratmann's control over SYG is so complete that he referred to SYG in the first-person at trial. When arguing at trial that SYG should be able to proceed *pro se* (contrary to well established law), Stratmann stated "I am a

single-member LLC . . . ." (DE [312] at 5:24-25). He also asserted "I personally guarantee all my debts," referring to SYG's liabilities. *Id.* at 33:2. Even Stratmann did not see a difference between himself and SYG. The evidentiary record, therefore, establishes that Stratmann exercised complete operational and financial domination over SYG.

Second, the evidence establishes that Stratmann used the corporate form for improper purposes. Stratmann used SYG as the vehicle through which he requested and received funds from Contessa Marine, misappropriated those funds, and later fabricated false documentation to hide the fact that he took the money. The evidence presented at trial demonstrated that Stratmann made multiple materially false representations concerning engine payments, Voith payments, Seakeeper procurement and pricing, and the project balance allegedly owed to SYG. Even though he informed Contessa Marine how the funds would be used when he requested them, now Stratmann cannot substantiate how at least $3,027,994.72 of Contessa Marine's project funds were applied. Stratmann "pocketed the money." (DE [312] at 119:6).

Third, Contessa Marine was injured by Stratmann's misuse of the corporate form. Contessa Marine wired more than $4.5 million in reliance on Stratmann's representations and funding requests. The evidence established that major vendors remained unpaid despite Stratmann's attestations to the contrary, major equipment was never ordered or delivered despite Stratmann requesting—and receiving—funds for that equipment, and substantial portions of the funds could not be substantiated or accounted for. At trial, Mr. Ivankovich testified that Stratmann had run away with Contessa Marine's money.

Altogether, the evidence tells one story: Stratmann completely dominated the corporate entity of SYG, Stratmann fraudulently misused the corporate form, and

Contessa Marine has had to pay the cost. Permitting Stratmann to avoid personal liability by invoking SYG's corporate form would sanction the very misconduct this Court has already condemned and would work a manifest injustice upon Contessa Marine. The Court therefore concludes that SYG functioned as Stratmann's alter ego in the conduct at issue, and the corporate veil is therefore properly pierced. Accordingly, Stratmann is personally liable for all obligations and tortious conduct of SYG arising from the Vessel refit project. The Final Judgment entered against SYG (DE [300]) can be enforced against Stratmann personally.

C. <u>Joint and Several Liability</u>

Not only can Contessa pierce the veil against Stratmann and hold him liable for the judgment against SYG, but also Stratmann is jointly and severally liable as a joint tortfeasor. Under well-established maritime tort principles, joint tortfeasors are jointly and severally liable for indivisible harm. *See Barrios v. Carnival Corp.*, 2019 WL 1876792, at *3 (S.D. Fla. 2019); *see also Groff v. Chandris, Inc.*, 835 F. Supp. 1408, 1409 (S.D. Fla. 1993) (under maritime law, courts adhere to the doctrine of joint and several liability, in which a plaintiff "may obtain judgment for the full amount from any and all tortfeasors."). For the reasons described in this Order, Stratmann, in connection with SYG, committed torts against Contessa. Stratmann personally requested funds, personally received the funds, personally distributed the funds, and personally misappropriated the funds. SYG did not do these acts alone—Stratmann personally carried them out. He committed multiple torts in conjunction with SYG, and for these he is jointly and severally liable. The Court now considers each tort.

1. Fraud

"When sitting in admiralty, courts generally apply common law fraud." *Ross v. Chisholm*, 2006 WL 8432290, at *14 (S.D. Fla. Dec. 29, 2006), *aff'd sub nom. Ross v. M/Y ANDREA ARAS*, 278 Fed. Appx. 988 (11th Cir. 2008); *Diesel "Repower", Inc. v. Islander Invs. Ltd.*, 271 F.3d 1318 (11th Cir. 2001) ("Admiralty law incorporates common law fraud."). In Florida, "the essential elements of common law fraud are: '(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation.'" *State Farm Mut. Auto. Ins. Co. v. Performance Orthopaedics & Neurosurgery, LLC*, 278 F. Supp. 3d 1307, 1317 (S.D. Fla. 2017) (quoting *Butler v. Yusem*, 44 So.3d 102, 105 (Fla. 2010)).[18]

Fraud claims are subject to a heightened pleading standard under Federal Rule of Civil Procedure 9(b): "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy this heightened pleading standard, fraud claims "must allege: (1) the precise statements, documents, or misrepresentations made; (2) the time and place of and person responsible for the statement; (3) the content and manner in which the statements misled the plaintiff; and (4) what the defendant gained by the alleged fraud." *BluestarExpo, Inc. v. Enis*, 568 F. Supp. 3d 1332 (S.D. Fla. 2021) (quoting *Leon v. Cont'l AG*, 301 F. Supp. 3d 1203, 1213 (S.D. Fla. 2017)).

[18] Courts sitting in admiralty may apply state law under certain circumstances. Since the common law of fraud is a matter of state law, the Court looks to state law principles. *See Smith v. Carnival Corp.*, 584 F. Supp. 2d 1343, 1351 (S.D. Fla. 2008).

Applying these principles to the evidentiary record developed at trial, the Court concludes that each element of fraud has been established.

a. False Representations

The evidence presented at trial demonstrates that Stratmann made material misrepresentations concerning the application of Contessa Marine's project funds. Stratmann represented that funds requested from Contessa Marine were required to satisfy specific vendor obligations and would be remitted to those vendors upon receipt. Those representations were conveyed through funding requests, spreadsheets, and related communications made to Contessa Marine. *See* (DE [309-3]). The representations included statements that substantial payments had been applied to vendors such as FDDA and Voith, representations regarding the procurement and pricing of Seakeeper equipment, and representations concerning the balance allegedly due as of March 31, 2023. As Mr. Ivankovich testified and vendor confirmations, subpoena responses, and the project accounting demonstrated, those funds were not applied as represented. Mr. Burell's affidavit also shows that Stratmann's representations were false. (DE [228-1]). And all of this evidence was uncontroverted at trial. The Court therefore finds that Stratmann's representations regarding vendor payments, project balances, the application of project funds, and the disposition of those funds, were false.

b. Knowledge of Falsity

The evidence further establishes that Stratmann knew these representations were false or made them in reckless disregard of their truth. Stratmann controlled the accounts receiving Contessa Marine's funds. Stratmann communicated directly with vendors regarding payment obligations. Stratmann approved expenditures and maintained

control over the project accounting. As the individual in control of the finances and in communication with the vendors, Stratmann knew that Contessa Marine's funds were not applied to vendors for the Vessel's refit. Stratmann, and only Stratmann, knows where the money actually went. The Court therefore finds that Stratmann knew the representations regarding vendor payments and project balances were false.

c. Intent to Induce Reliance

The Court further finds that Stratmann made these representations with the intent that Contessa Marine rely upon them to transmit funds to Stratmann and SYG. Stratmann made the funding requests and created the spreadsheets with the express intention that, based on those representations, Contessa Marine would provide more funds. Stratmann also expected and intended that Contessa Marine would rely upon his representations regarding vendor obligations and project balances when authorizing additional wire transfers.

d. Justifiable Reliance and Damages

Finally, Contessa Marine justifiably relied on Stratmann's representations to its own detriment. Contessa Marine relied on Stratmann as the project manager responsible for coordinating vendors, administering the project finances, and maintaining the accounting records. Contessa Marine did not have independent access to vendor payment records, vendor contracts, or other vendor communications at the time the funding requests were made. Contessa Marine justifiably relied on Stratmann to do the job Contessa Marine had hired him to do: coordinate with vendors and contractors and oversee the refitting of the vessel. This included relying on his representations about funding for vendors.

As a direct result of Stratmann's representations, Contessa Marine transmitted millions of dollars to Stratmann and SYG. But many of those funds were misappropriated and never applied to the vendors, as confirmed by vendor and financial records. Contessa Marine therefore did not receive certain equipment and services it had already paid Stratmann for, and Contessa Marine had to go to major vendors and pay them directly in order to obtain equipment and services necessary for the project. As a result of Stratmann's misrepresentations, Contessa Marine sustained millions of dollars in damages.

In summary, the Court concludes that Stratmann knowingly made material misrepresentations concerning the application of project funds, Contessa Marine reasonably relied upon those misrepresentations when transmitting project funds, and as a direct result of that reliance, Contessa Marine sustained substantial financial damages. Contessa Marine has proven fraud against Stratmann under the general maritime law of the United States.[19]

2. <u>Conversion</u>

Conversion is "an unauthorized act which deprives another of his identifiable property permanently or for an indefinite time." *Rosenthal Toyota, Inc. v. Thorpe*, 824 F.2d 897, 902 (11th Cir. 1987). "In the admiralty context, as elsewhere, conversion is simply an intentional and wrongful exercise of dominion or control over a chattel, which seriously interferes with the owner's rights in the chattel." *Middleton v. MN Glory Sky 1*, 567 Fed. Appx. 811, 813 (11th Cir. 2014) (quoting *Evergreen Marine Corp. v. Six Consignments of Frozen Scallops,* 4 F.3d 90, 94 (1st Cir.1993). The elements of conversion at admiralty

[19] Stratmann's fraudulent conduct independently supports piercing the corporate veil and imposing personal liability.

are the same as those under Florida law. *See id.* at 813 n.4; *Thyssen, Inc. v. S.S. Rio Capaya*, 1988 WL 114535, at *2 n.1 (M.D. Fla. Feb. 17, 1988) ("The parties apparently agree that the elements of the tort of conversion under either general maritime law or under the laws of the state of Florida are identical.").

To state and prove a claim for conversion, the plaintiff must show ownership of the property and wrongful dominion or control over that property. *Indus. Park Dev. Corp. v. Am. Exp. Bank*, FSB, 960 F. Supp. 2d 1363, 1366 (M.D. Fla. 2013). Money can be the property subject to a conversion claim when there is "an obligation for the receiver to keep intact or deliver the specific money at issue." *Id.*; *Elite Premium Finance, Inc. v. Wells Fargo Bank, N.*A, 472 F.Supp.3d 1231, 1235 (S.D. Fla. 2020) (same).

Here, Contessa Marine entrusted Stratmann with certain property that Contessa Marine owned—money—that Stratmann was directed to use for a specific use. He did not, and instead wrongfully controlled and misappropriated that money belonging to Contessa Marine. This case is not a mere dispute over a general debt that could be discharged by payment of money. Rather, the evidence established that Contessa Marine paid specific, identifiable sums for specific project purposes, including vendor payments, engine procurement, Voith jet procurement, Seakeeper acquisition, and yard charges, based on Stratmann's funding requests and allocation representations. Each transmittal of funds was specifically identified for a certain transaction or purchase. Stratmann owed Contessa Marine a duty, as the project manager, to use those identified funds for a specific purpose, but he did not. Instead, he used those funds for some other personal purpose, contrary to the purpose for which Contessa Marine had entrusted him with the funds. Once Contessa Marine entrusted the funds to Stratmann, he exclusively

controlled them. The evidence shows he failed to apply $3,027,994.72 as required, and he has failed to account for those monies. Whether he is in possession of those funds still or put them to a different purpose, he has exercised control and dominion of Contessa Marine's funds contrary to their intended use. The Court recognizes that Stratmann's exercise of dominion over Contessa Marine's entrusted funds contrary to their intended purpose constitutes conversion.

3. Negligent Misrepresentation

Courts in admiralty apply the following standard for a claim of negligent misrepresentation: "a plaintiff must allege: (1) misrepresentation of a material fact; (2) that the representor made the misrepresentation without knowledge as to its truth or falsity or under circumstances in which he ought to have known of its falsity; (3) that the representor intended that the misrepresentation induce another to act on it; and (4) that injury resulted to the party acting in justifiable reliance on the misrepresentation." *Dome v. Celebrity Cruises, Inc.*, 595 F.Supp.3d 1212, 1223 (S.D. Fla. 2022) (quoting *Ceithaml v. Celebrity Cruises, Inc.*, 207 F. Supp. 3d 1345, 1352–53 (S.D. Fla. 2016)). *See also Woodley v. Royal Caribbean Cruises, Ltd.*, 472 F. Supp. 3d 1194 (S.D. Fla. 2020).

Because negligent misrepresentation is a fraud-based claim, this claim too is subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *Woodley*, 472 F. Supp. 3d at 1206. "[T]o pass Rule 9(b) muster, the Complaint must set forth particular allegations about the 'who, what, when, where, and how' of the fraud." *Dome*, 595 F. Supp. 3d at 1223 (quoting *Ceithaml*, 207 F. Supp. 3d at 1353).

Here, Contessa Marine has both alleged with sufficient specificity, and proven at trial, its negligent misrepresentation claim. The factual record supporting Contessa

Marine's fraud claim proves negligent misrepresentation. As described above, Contessa Marine has shown that Stratmann made material misrepresentations of how he would apply Contessa Marine's funds, he knew or should have known these statements were false, he intended Contessa Marine to rely on his statements and transmit him the requested funds, and Contessa Marine relied on his representations, to the detriment of $3,027,994.72. Contessa Marine has proven negligent misrepresentation.

4. Breach of Fiduciary Duty

Although admiralty law does not provide for an independent claim for breach of fiduciary duty, *see, e.g.*, *Great Lakes Ins. SE v. Boat Rental Miami, Inc.*, 2020 WL 264674, at *4-5 (S.D. Fla. Jan. 17, 2020), courts sitting in admiralty may apply state law "when neither statutory nor judicially created maritime principles provide an answer to a specific legal question." *Coastal Fuels Mktg., Inc. v. Fla. Exp. Shipping Co.*, 207 F.3d 1247, 1251 (11th Cir. 2000). In Florida, the elements of a claim for breach of fiduciary duty are: (1) the existence of a fiduciary duty; (2) breach; and (3) damages proximately caused by the breach. *Gracey v. Eaker*, 837 So. 2d 348, 353 (Fla. 2002). A fiduciary relationship can be express or implied. *Maxwell v. First United Bank*, 782 So. 2d 931, 933–34 (Fla. 4th DCA 2001). "Express fiduciary relationships are created by contract . . . or can be created by legal proceedings . . . ." *Id.* On the other hand, an implied fiduciary relationship can be inferred from "the circumstances surrounding the transaction and the relationship of the parties and may be found when confidence is reposed by one party and a trust accepted by the other." *Id*. at 933–34 (citation modified).

Courts generally recognize two main fiduciary duties: the duty of care and the duty of loyalty. *See Taubenfeld v. Lasko*, 324 So. 3d 529, 538 (Fla. 4th DCA 2021). "The duty

of care is the requirement to 'use that amount of care which ordinarily careful and prudent men would use in similar circumstances, and consider all material information reasonably available in making business decisions' . . . ." *Id.* (quoting *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 749 (Del. Ch. 2005)). The duty of loyalty requires fiduciaries to put the interests of the beneficiary first and prohibits fiduciaries from acquiring a benefit at the expense of the beneficiary. *Id.*

Here—based on the record and the facts established at trial—Stratmann's express representations, coupled with his acceptance of exclusive control over Contessa Marine's project funds and financial reporting, created an implied fiduciary relationship as a matter of law. Contessa Marine entrusted Stratmann with control of millions of dollars in project funds under an open-book project-management agreement. This was not an arms-length contractual relationship. Rather, Contessa Marine relied on Stratmann to faithfully apply the funds entrusted to him, with virtually no oversight. Stratmann accepted that trust by assuming responsibility for requesting project funds, contracting vendors, applying project funds to vendor obligations, maintaining accounting records, and reporting on the status of the project and its finances. Stratmann owed a duty to Contessa Marine to apply the funds as represented and requested, to provide accounting for those funds, and to not use those funds for his own benefit. Stratmann also fostered and reinforced that relationship of trust through repeated statements emphasizing transparency, accountability, and acting in Contessa Marine's best interests with respect to the project.

But Stratmann breached his fiduciary duties of care and loyalty. The evidence conclusively established that Stratmann breached his fiduciary duties by failing to maintain open-book accounting records, making materially false representations

regarding funding requests and vendor balances, failing to apply earmarked funds to the vendor obligations for which they were specifically designated, failing to provide accurate accounting of how Stratmann and SYG were applying Contessa Marine's funds, creating unreliable after-the-fact documentation in an attempt to justify missing funds; and misappropriating Contessa Marine's funds and project assets for purposes other than those represented. These actions constitute clear breaches of the fiduciary duties owed by Stratmann to Contessa Marine. Those breaches directly and proximately caused the financial losses established in the evidentiary record. The Court therefore concludes that Contessa Marine has proven breach of fiduciary duty against Stratmann.

D. Liability

In summary, the Court concludes that Stratmann is personally liable for the damages previously awarded against SYG. *See* (DE [300]). Stratmann is also jointly and severally liable as a joint tortfeasor for the damages established in the record and at trial.

IV. DAMAGES

Having determined that Stratmann is personally liable for the judgment against SYG, as well as being personally liable as a joint tortfeasor, the Court turns to damages. The Court entered Final Default Judgment against SYG in the principal amount of **$5,403,414.94.** (DE [300]). Stratmann is personally liable for this judgment.

In the alternative, Stratmann is liable for the following damages:

1. $3,027,994.72 of unaccounted monies that Contessa Marine entrusted to Stratmann;

2. $1,016,242.50 paid directly by Contessa Marine to FDDA for engines that Contessa Marine has yet to receive;[20] and
3. $226,502.19 wrongfully retained following the LMC chargeback component, which Stratmann personally directed.
4. In total, Stratmann is personally liable as a joint tortfeasor for **$4,270,739.41.**[21]

V. CONCLUSION

In summary, Stratmann is personally liable to Contessa Marine for the **$5,403,414.94** judgment against SYG, and Stratmann is personally liable to Contessa Marine for his own torts for **$4,270,739.41**.[22] Final judgment shall issue by separate order.

There are currently five pending motions on the docket. Accordingly, it is hereby

**ORDERED AND ADJUDGED** that as follows:

1. (DE [270]) is **DENIED AS MOOT.**
2. (DE [316]) is **DENIED** for the reasons discussed above.
3. (DE [317]) is **DENIED**.

---

[20] These damages are on top of the monies entrusted to Stratmann, as Contessa Marine is currently out the funds given to Stratmann for the engine and the monies paid to FDDA.

[21] This number diverges from the judgment against SYG, because it does not include $786,174.43 for the Seakeepers or $346,500.00 for the Voith jets. At trial, the evidence showed that Contessa Marine gave Stratmann $827,699.42 for the Seakeepers, which was part of the unaccounted for $3,027,994.72. (DE [312], 96:16-97:2). But unlike the MTU engines, there is no evidence that Contessa Marine paid for the Seakeepers directly on top of funding Stratmann. Contessa Marine's only damages for the Seakeepers is the $827,699.42 it paid Stratmann for Seakeepers it never received. Similarly, for the Voith jets, Contessa Marine was damaged by having to pay Stratmann for the jets and then having to pay Voith directly the $346,500.00. But the damages came from paying Stratmann funds he misappropriated—the direct payment to Voith for the jets was not damages. As discussed earlier, the court considers Contessa Marine to have received the jets, so the $346,500.00 was simply a payment for a product.

[22] Once Stratmann has paid the $4,270,739.41 in damages awarded against Stratmann personally in this Order, Stratmann may move to set off any difference between the damages awarded against SYG (DE [300]) and the damages awarded personally against Stratmann in this Order for his own tortious conduct. That is to say, Stratmann does not owe $9,674,154.35. He owes $4,270,739.41 as an individual, and he and SYG jointly and severally owe $5,403,414.94 based on SYG's default and the Court's analysis here. Should the appellate court find the piercing the corporate veil analysis to be in error, SYG still owes $5,403,414.94, and Stratmann still individually owes a subset of that equal to $4,270,739.41.

4. (DE [321]) is **GRANTED**. Accordingly, the Clerk of Court shall **STRIKE** (DE [318]). The Court has reiterated numerous times that SYG, as an LLC, cannot proceed pro se. By **September 25, 2026**, Plaintiff Contessa Marine may file a motion for attorney fees—with supporting documentation—for all time spent responding to papers filed by Stratmann on behalf of SYG since the clerk entered default against SYG for failure to obtain counsel. (DE [267]).

The Clerk of Court is directed to **CLOSE** this case, **CANCEL** all hearings and deadlines, and **DENY AS MOOT** any pending motions. The Court retains jurisdiction to consider any appropriate fee motions. **DONE AND ORDERED** in Chambers, Fort Lauderdale, Florida, this 15th day of September 2026.

RAAG SINGHAL
UNITED STATES DISTRICT JUDGE

Copies furnished counsel via CM/ECF
and via Postal Service to:

Charles Jake Stratmann
545 NE 17th Ave
Fort Lauderdale, FL 33001